*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0311p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TIMOTHY HOFFNER,

        *Petitioner-Appellant,*

    *v.*

No. 08-4013

MARGARET BRADSHAW, Warden,

        *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-00687—James S. Gwin, District Judge.

Argued: November 18, 2009

Decided and Filed: September 23, 2010

Before: BOGGS, GIBBONS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Sarah L. Leatherman, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, Michael Montgomery, BAKER AND HOSTETLER, LLP, Cleveland, Ohio, for Appellant. Sarah L. Leatherman, Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. Petitioner–appellant Timothy Hoffner appeals the district court's order denying his petition for *habeas corpus*. Hoffner was convicted of aggravated murder, aggravated kidnapping, and robbery and was sentenced to death. In his petition, he claims that the trial court improperly weighed aggravating

and mitigating circumstances, that he received ineffective assistance of trial and appellate counsel, that statements were admitted at trial in violation of his *Miranda* rights, and that the cumulative effect of the errors at trial violated his constitutional rights. For the reasons set forth below, we now affirm the district court's decision and deny Hoffner's *habeas* petition.

I.

The Ohio Supreme Court summarized the facts of the case as follows:

{¶ 1} On September 22, 1993, Timothy L. Hoffner, defendant–appellant, and Archie Dixon kidnapped and robbed Christopher Hammer, then drove Hammer to a remote area where they buried him alive in a shallow grave and left him to die.

{¶ 2} Hoffner was convicted of the aggravated murder, aggravated robbery, and kidnapping of Hammer, and he was sentenced to death.

{¶ 3} Hoffner and Hammer met in August 1993. For a short period of time in mid-August 1993, Hoffner, Hammer, and Dixon lived at the Toledo home of Kirsten Wilkerson, Dixon's girlfriend.

{¶ 4} In early September 1993, Michael Elting, a friend of Hammer, Hoffner, and Dixon, borrowed Hammer's car, a 1987 Dodge Daytona, to go to the movies with Hoffner and Dixon. According to Elting, Hoffner and Dixon discussed "how to get rid of [Hammer's] car," and Hoffner said that he knew a place where he could take the car, presumably after Hammer was killed. Approximately one month after Hammer's disappearance, Elting discovered Hammer's car at a used car lot in Toledo.

{¶ 5} On the afternoon of September 21, Dixon told Wilkerson that he and Hoffner were going to "get [Hammer] tonight." Wilkerson understood this to mean that Dixon and Hoffner were going to kill Hammer.

{¶ 6} In the early morning of September 22, Hoffner, Dixon, and Hammer went to Wilkerson's house. Once there, Hoffner and Dixon attacked Hammer. Hoffner restrained Hammer in a headlock while Dixon beat him. Hoffner tried to break Hammer's neck, and Dixon struck Hammer in the head with a wine bottle. Hoffner and Dixon then tied Hammer to a bunk-bed ladder, and Dixon went through Hammer's wallet, taking out his money, birth certificate, and Social Security card.

Then Hoffner and Dixon discussed how they should dispose of Hammer's body.

{¶ 7} While Hammer remained tied to the bunk-bed ladder, Hoffner and Dixon left Wilkerson's house to dig a grave. Hoffner and Dixon returned to Wilkerson's house and they, along with Wilkerson, drove Hammer, blindfolded, to the gravesite in Hammer's car. Wilkerson stayed at the car while Hoffner and Dixon walked Hammer into the woods, where they permitted Hammer to smoke a cigarette. Then they gagged and again blindfolded Hammer, tied his hands and feet behind his back, grabbed him by his arms and legs, and dropped him into the grave, still alive. At one point, Hammer was able to remove the gag from his mouth and free one of his legs. Hoffner jumped into the grave and placed his foot over Hammer's mouth when Hammer yelled for help. Hoffner and Dixon then held Hammer down and covered him with dirt. After Hammer was completely buried, Hoffner and Dixon walked back and forth across the grave, packing down the dirt. Hoffner, Dixon, and Wilkerson then returned to Wilkerson's house in Hammer's car.

{¶ 8} After killing Hammer, Hoffner and Dixon carried out their plan to sell his car. On September 25, Dixon obtained a state of Ohio identification card with his photograph but in Hammer's name. On September 30, Hoffner and Dixon went to the automobile title bureau, where Dixon obtained a duplicate certificate of title for Hammer's car using the fraudulent ID card. Hoffner and Dixon then took Hammer's car to a used car lot, where they sold the car for $2,800.

{¶ 9} By November 8, 1993, police officers investigating Hammer's disappearance had located his Dodge Daytona at a used car lot in Toledo, had confirmed its unauthorized sale on September 30, and had identified Dixon as the prime suspect in the vehicle transaction. On November 9, police went to Wilkerson's home and arrested Dixon for forgery. The police also executed a search warrant at Wilkerson's home. During the search, police questioned Hoffner regarding Hammer's disappearance. Hoffner denied involvement but made statements implicating Dixon. Hoffner agreed to accompany police detectives downtown to make a statement. On the way to the station, Hoffner told police that Dixon had shown him the location of Hammer's body, and he then led police to the gravesite.

{¶ 10} Once at the station, police read Hoffner his *Miranda* rights, but Hoffner was not placed under arrest. Hoffner waived his rights and gave a taped account of Dixon's involvement in Hammer's murder. After Hammer's body was discovered, Dixon confessed to Hammer's murder and also implicated Hoffner. Police subsequently arrested Hoffner on November 10 at his mother's home. At police headquarters, detectives

read Hoffner his *Miranda* rights, and Hoffner signed a waiver-of-rights form. Hoffner then gave a taped statement confessing to his part in Hammer's death.

{¶ 11} Cynthia Beisser, Deputy Coroner of Lucas County, performed an autopsy and concluded that Hammer had died of asphyxiation. According to Dr. Beisser, Hammer likely died within five minutes of being buried alive, and he might have remained conscious during the first two to three minutes.

{¶ 12} A grand jury indicted Hoffner, Dixon, and Wilkerson for the aggravated murder, kidnapping, and aggravated robbery of Hammer. Hoffner was indicted on three counts of aggravated murder. Count One of the indictment charged Hoffner with aggravated murder involving prior calculation and design. [Ohio Rev. Code Ann. §] 2903.01(A). Count Two charged Hoffner with aggravated murder while committing kidnapping, and Count Three charged Hoffner with aggravated murder while committing aggravated robbery, both pursuant to [Ohio Rev. Code Ann. § 2903.01(B). Hoffner was additionally indicted for kidnapping in Count Four, aggravated robbery in Count Five, and three counts of forgery in Counts Six, Seven, and Eight.

{¶ 13} The three counts of aggravated murder each contained two [Ohio Rev. Code Ann. §] 2929.04(A)(7) death penalty specifications. The first specification charged aggravated murder during a kidnapping, and the second charged aggravated murder during an aggravated robbery.

{¶ 14} The jury convicted Hoffner as charged and recommended the death penalty. Thereafter, the trial court sentenced Hoffner to death for the murder, to ten to 25 years each for kidnapping and aggravated robbery, and to 18 months for each forgery charge. On appeal, the court of appeals affirmed Hoffner's convictions and death sentence.

*State v. Hoffner (Hoffner II)*, 811 N.E.2d 48, 51–52 (Ohio 2004).

After considering the thirteen propositions of law Hoffner raised on direct appeal, the Supreme Court of Ohio rejected each of them and affirmed Hoffner's conviction and sentence on July 14, 2004. *Id.* at 67. The Supreme Court denied Hoffner's petition for a writ of *certiorari*. *Hoffner v. Ohio*, 543 U.S. 1058 (2005). While his direct appeal was pending, Hoffner also sought state post-conviction relief under Ohio Revised Code § 2953.21 on three grounds. His petition was dismissed by the trial court, and the dismissal was affirmed by the Ohio Court of Appeals on September 30, 2002. *State v. Hoffner (Hoffner III)*, No. L-01-1281, 2002 WL 31162813 (Ohio Ct. App. Sept. 30,

2002).  The Ohio Supreme Court denied leave to appeal.  *State v. Hoffner*, 814 N.E.2d 489 (Ohio 2004).  On June 6, 2006, Hoffner applied to reopen his appeal under Ohio Appellate Rule 26(B) in order to assert a claim of ineffective assistance of appellate counsel.  As Hoffner filed the petition roughly five years after his conviction became final—long after the ninety-day window provided for by statute, *see* Ohio App. R. 26(B)(1)—the Ohio Court of Appeals recognized that the petition was untimely but nonetheless denied the petition on the merits.  *State v. Hoffner (Hoffner IV)*, No. L-95-181, slip op. at 3, 15 (Ohio Ct. App. Aug. 24, 2006).  The Ohio Supreme Court affirmed the lower court's judgment but did so on untimeliness grounds only.  *State v. Hoffner (Hoffner V)*, 860 N.E.2d 1021, 1023 (Ohio 2007).

On January 6, 2006, Hoffner filed a *habeas* petition in federal district court raising thirteen grounds for relief.  *Hoffner v. Bradshaw (Hoffner VII)*, No. 3:05-cv-00687, slip op. at 6 (N.D. Ohio July 23, 2008).  On February 8, 2006, the district court held the case in abeyance to allow Hoffner to file his Rule 26(B) motion.  *Hoffner v. Bradshaw (Hoffner VI)*, No. 3:05-cv-00687, 2007 WL 3046464, at *1 (N.D. Ohio Oct. 16, 2007).  After the state filed its return of writ, Hoffner withdrew two of the claims, conceding that they were procedurally defaulted.  *Hoffner VII*, slip op. at 54–55.  The district court rejected the remainder of Hoffner's claims, finding that they were either meritless or procedurally defaulted, and denied the petition.  *Id.* at 12–65.  The court then granted a certificate of appealability ("COA") as to all of Hoffner's claims except one.  *Id.*

On appeal, Hoffner failed to brief four of the ten claims for which the district court granted a COA and therefore has abandoned them.  *See* Fed. R. App. P. 28(a)(9)(A); *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007).  Thus, we will address the six issues that Hoffner has preserved:

> 1. Whether Hoffner's death sentence violated his due process rights because it was based on the consideration of improper aggravating circumstances.
>
> 2. Whether trial counsel's performance at the guilt phase of trial was constitutionally ineffective.

3. Whether trial counsel's performance at the penalty phase of trial was constitutionally ineffective.

4. Whether appellate counsel's performance was constitutionally ineffective.

5. Whether Hoffner's conviction is invalid because it was based on statements obtained in violation of his *Miranda* rights.

6. Whether the cumulative effect of the errors in this case violated Hoffner's constitutional rights.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, governs all *habeas* petitions filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 326–27 (1997). AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court makes "an unreasonable application of" Supreme Court precedent under § 2254(d)(2) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or if the court unreasonably extends or refuses to extend existing Supreme Court precedent to new

factual situations where it should apply. *Id.* at 407. Under AEDPA, the question for this court to answer "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Factual findings made by state courts based on the trial record are entitled to a presumption of correctness that may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998).

However, federal courts need not review every point of error raised by a *habeas* petitioner. When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply the three-prong test initially laid out in *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986):

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . .

*Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138). If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138.

III.

Hoffner claims that the trial court violated his due process rights by improperly weighing the statutory aggravating factors of his crime. This argument has two sub-claims. First, Hoffner argues that the trial court wrongly considered the nature and circumstances of the offense to be an aggravating factor. Second, Hoffner argues that the trial court considered various elements of the charged statutory aggravating factor as separate aggravating factors, thus multiplying the value of what should have been one factor.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). State-law errors may warrant *habeas* relief if the errors "rise for some other reason to the level of a denial of rights protected by the United States Constitution." *Barclay v. Florida*, 463 U.S. 939, 957–58 (1983). Nonetheless, if a trial court considers unconstitutional aggravating factors, the Supreme Court has held that this error can be cured by the state appellate court "independently 'reweighing' aggravating and mitigating factors and reaching a sentence without the consideration of the factors found impermissible at the trial level." *See Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006) (citing *Clemons v. Mississippi*, 494 U.S. 738, 740 (1990)); Ohio Rev. Code Ann. § 2929.05(A) ("The . . . supreme court . . . shall review and independently weigh all of the facts . . . and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.").

A.

In support of his claim that the trial court improperly considered the nature and circumstances of his crime, Hoffner points to various parts of the sentencing opinion where the trial judge used several "inflammatory" adjectives to describe Hoffner's conduct. For example, the trial court described Hoffner's crime as "graphic," "macabre," "sinister," and "depraved." *State v. Hoffner (Hoffner I)*, No. CR93-7212A, slip op. at 4–6 (Ct. Com. Pl. June 7, 1995). Further, Hoffner claims, the trial court

explicitly considered impermissible factors when it allegedly explained that its job was to "weigh[] the relative heinousness" of his crime.  Appellant Br. at 18.  He claims that the trial judge's conclusion is evidence of improper consideration:

> Sympathy for the defendant's mistreatment as a child, however, can in no way excuse the depraved, violent and calculated nature of the acts he committed against Christopher Hammer.  It was, and is the conclusion of this Court that the aggravating circumstances so clearly demonstrated by the evidence at trial, far, far outweighed the modest cumulative mitigating circumstances presented in this case and during the penalty phase.

*Hoffner I*, slip op. at 8.  Hoffner claims that the trial court's actions violated his due process rights under the Fourteenth Amendment and *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

Hoffner properly preserved this claim by raising it on direct appeal, but the Ohio Supreme Court found the claim to be meritless.  The court noted that the trial court never referred to the nature and circumstances of the crime as an aggravating circumstance and that the sentencing opinion "reflect[ed] the trial court's understanding of the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense."  *Hoffner II*, 811 N.E.2d at 60–61.  Further, the court explained that the trial court can evaluate the nature and circumstances in order to conclude that "no mitigating feature can be extracted."  *Id.* at 61 (quoting *State v. Steffen*, 509 N.E.2d 383, 390 (Ohio 1987)) (internal quotation marks omitted).  The court also conducted an extensive review of the penalty-phase evidence, independently weighed the aggravating and mitigating factors, and concluded that the death penalty was appropriate.  *Id.* at 62–66.

We agree with the district court that there was no violation, or unreasonable application, of clearly established Supreme Court law.  As noted above, a violation of state law is not grounds for *habeas* relief unless it rises to the level of a due process deprivation.  *Estelle*, 502 U.S. at 67–68.  We find no such deprivation; we agree with the Ohio Supreme Court that no violation of state law occurred, let alone one of such magnitude as to violate due process.  Furthermore, the Ohio Supreme Court's

independent reweighing of the relevant evidence cured any error that the trial court may have committed.  Hoffner has made no showing of fundamental unfairness, and we affirm the district court's denial of relief on this sub-claim.

B.

Hoffner also argues that the trial court improperly multiplied the statutory aggravating circumstances at sentencing.  Hoffner was charged in the indictment with three separate counts of murder—murder with prior calculation and design, murder in the course of kidnapping, and murder in the course of aggravated robbery.  For each count, the indictment provided two death penalty specifications: that the offense was committed while committing kidnapping and that the offense was committed while committing aggravated robbery, both pursuant to Ohio Rev. Code Ann. § 2929.04(A)(7). The specification requires that, in addition to proving that the murder was committed in the course of an enumerated violent felony, the government must also prove that "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."  Ohio Rev. Code Ann. § 2929.04(A)(7).  The jury found Hoffner guilty of all three counts of murder and of both specifications for each count.  However, the trial court held that the two counts of murder during the commission of kidnapping and aggravated robbery constituted allied offenses of similar import under Ohio Rev. Code Ann. § 2941.25(A) and sentenced Hoffner only for murder with prior calculation and design.

Hoffner argues that, under Ohio law, the court could not have used the kidnapping and aggravated robbery as separate aggravating circumstances because they both fall under the same statutory provision.  *See* Ohio Rev. Code Ann. § 2929.04(A)(7). As evidence that the aggravating circumstances were multiplied, Hoffner points to the trial court's sentencing opinion, where it wrote that "it was established beyond a reasonable doubt that the aggravated murder . . . was committed by . . . Hoffner in the commission of both a kidnapping and an aggravated robbery, and that he also committed the aggravated murder with prior calculation and design."  *Hoffner I*, slip op. at 4.  In the

next sentence, however, the court writes that "[t]hese findings, of course, merely reiterate the jury's verdicts." *Id.* Hoffner also points out that the trial court referred to the death penalty specification under subsection (A)(7) as "aggravating circumstances" throughout the opinion. Hoffner cites to *State v. Green*, 738 N.E.2d 1208, 1222 (Ohio 2000), in which the Ohio Supreme Court held that it was improper for the trial court to have "consider[ed] as two separate and distinct aggravating circumstances [the defendant's] involvement in committing 'both an aggravating robbery and a kidnapping'" when the indictment had charged a single death specification of "murder while committing or attempting to commit 'kidnapping *or* aggravated robbery.'"

The district court rejected this sub-claim on the grounds that it is a violation of state, not federal, law and that even if the trial court's alleged error rose to the level of a due process violation, the state supreme court cured it through independent reweighing. *Hoffner VII*, slip op. at 17–18. We agree. In the first instance, as the Ohio Supreme Court held, *see Hoffner II*, 811 N.E.2d at 61, two separate death penalty specifications were listed in the indictment, rather than just one as in *Green*. Thus, it was not improper for the trial court to refer to "aggravating circumstances." The trial court's conjunctive reference to Hoffner's prior calculation and design in its sentencing opinion was in reference to the jury's verdict finding such facts beyond a reasonable doubt. But even if this were error, the Ohio Supreme Court conducted a detailed independent review of the evidence presented at the penalty phase. It found that "the evidence established beyond a reasonable doubt the *two* [§] 2929.04(A)(7) aggravating circumstances" and concluded that "Hoffner's collective mitigation evidence is relatively modest when compared with the aggravating circumstances." *Hoffner II*, 811 N.E.2d at 65, 66 (emphasis added). Hoffner does not object to the Ohio Supreme Court's reweighing of the evidence. We therefore affirm the district court's denial of *habeas* on this sub-claim.

IV.

Hoffner's second claim is that his trial counsel performed ineffectively at the guilt phase of trial by: (1) failing to argue that Dixon, not Hoffner, was the principal offender and (2) failing to move to suppress Hoffner's taped confession on the ground

that he had previously requested counsel.  Hoffner raised both of these arguments for the first time in his state post-conviction petition.[1]  *See Hoffner III*, 2002 WL 31162813, at *3 (third and sixth sub-claims).  Because the claims did not involve evidence outside of the record and therefore could have been raised on direct appeal, the court of appeals found both sub-claims to be barred by *res judicata*.  *Id.* at *5 (citing *State v. Cole*, 443 N.E.2d 169, syllabus (Ohio 1982)).  The Supreme Court of Ohio denied review.

> Under Ohio's doctrine of *res judicata*,
>
> a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967).  In *Cole*, 443 N.E.2d at 171, "the Ohio Supreme Court held that res judicata is a proper basis upon which to dismiss an ineffective-assistance claim in a petition for post-conviction relief where a defendant who is represented by new counsel on direct appeal fails to raise that claim and the basis for that claim 'could fairly be determined without examining evidence outside the record.'"  *Fautenberry v. Mitchell*, 515 F.3d 614, 633 (6th Cir. 2008).  Thus, in *Fautenberry* we held that "Ohio's application of res judicata pursuant to *Cole* is an actually enforced, adequate and independent state ground upon which the Ohio state courts consistently refuse to review the merits of a defendant's claims." *Id.*  The district court followed this rule and held that this claim was procedurally defaulted.  We agree.

The first three prongs of the *Maupin* test for procedural default are all met in this instance.  As discussed, (1) Hoffner failed to raise these ineffective-assistance sub-claims on direct appeal, thus failing to comply with a state procedural rule; (2) the court of appeals enforced the rule by holding the claim barred by *res judicata*; and (3) *res*

---

[1]On direct appeal, Hoffner raised a claim that counsel failed to file a post-hearing brief in support of his motion to suppress statements made to the police. *See Hoffner II*, 811 N.E.2d at 56. That claim is distinct from the suppression claim raised here.

*judicata* is an adequate and independent state ground on which to foreclose federal review. *See Maupin*, 785 F.2d at 138.

In his reply brief, however, Hoffner offers two reasons why his claim is not procedurally defaulted. First, he claims that the state court improperly applied *res judicata* because his claim was, in fact, based on evidence outside the record. *See Hill v. Mitchell*, 400 F.3d 308, 320 (6th Cir. 2005) ("[T]he Ohio Court of Appeals' improper application of its res judicata rule does not bar our review [of a federal habeas claim.]"). Hoffner's outside evidence consists of "an expert affidavit concerning the standards of representation in a capital case." (Reply Br. at 10.) In order to excuse the procedural default, the proffered affidavit must have been required, in addition to the original record, to bring Hoffner's claim for ineffective assistance on direct appeal. *See State v. Gibson*, 430 N.E.2d 954, 957 (Ohio Ct. App. 1980) (citing Ohio Rev. Code Ann. § 2953.21). Yet, nothing in the sub-claims brought here suggests that the affidavit was necessary and that they could not have been brought without it. Thus, procedural default is not excused on this ground.

Hoffner also argues that procedural default should be excused because his appellate counsel's deficient performance in not raising these claims on direct appeal constitutes cause and prejudice under the fourth part of the *Maupin* test.[2] *See Maupin*, 785 F.2d at 138 ("Once the court determines that [the first three parts of the test have been met], then the petitioner must demonstrate under *Sykes* that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)) (additional citations omitted)). Ineffective assistance of appellate counsel can constitute cause to excuse a procedural default. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Howard v. Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005).

Appellate counsel's failure to raise these guilt-phase ineffective-assistance claims does not establish cause to excuse the default, however, because the underlying claims

---

[2]Although Hoffner did not raise this defense in his principal brief, he did raise it in his reply brief in response to the government's assertion of procedural default in its brief.

are meritless.  To establish a claim of ineffective assistance of trial or appellate counsel, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), Hoffner must show (1) that his counsel's performance was deficient and (2) that the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).  To prove deficiency, Hoffner must show that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Prejudice can be shown by proving "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Hoffner's first sub-claim—that trial counsel were deficient for failing to argue that Hoffner was not a principal offender—is meritless because, as the district court found, "ample evidence showed that Hoffner and Dixon fully collaborated in burying Hammer alive."  *Hoffner VII*, slip op. at 22.  "To be eligible for the death penalty under [Ohio Rev. Code Ann. §] 2929.04(A)(7) as 'the principal offender,' the defendant must have been the actual killer."  *State v. Taylor*, 612 N.E.2d 316, 325 (Ohio 1993) (citing *State v. Penix*, 513 N.E.2d 744, 746 (Ohio 1987)).  Substantial evidence  at trial shows that Hoffner was intimately involved in the planning and execution of the murder. Hoffner and Dixon discussed killing Hammer and selling his car well in advance of the murder.  Hoffner held Hammer in a headlock and tried to break his neck while Dixon beat him.  While Dixon was burying Hammer, Hoffner jumped into the grave and put his foot on Hammer's mouth to prevent Hammer from crying for help.

The record is replete with evidence that Hoffner was the "actual killer" of Hammer.  Hoffner's arguments that, because Hoffner followed Dixon, only Dixon could have been the principal offender are irrelevant because, under Ohio law, two defendants can be considered principal offenders when they act in concert to cause the death of another. *See State v. Franks*, No. 18767, 1998 WL 696777, at *6 (Ohio Ct. App. Oct. 7, 1998) (citing *State v. Keene*, No. 14375, 1996 WL 531606, at *34–35 (Ohio Ct. App. Sept. 20, 1996)).  Especially considering the deference given to counsel's tactical choices, it is clear that counsel's decision not to argue that Hoffner was not a principal

offender was not deficient. Furthermore, trial counsel's failure to raise this argument could not have been prejudicial because, under Ohio Rev. Code Ann. § 2929.04(A)(7), a non-principal offender is eligible for the death penalty if he acted with prior calculation and design. Hoffner does not argue that counsel were ineffective for failing to argue that he did not act with prior calculation and design, and the record clearly supports the jury's finding that his actions were premeditated. We affirm the district court's holding that this sub-claim was procedurally defaulted.

Hoffner's second sub-claim is that trial counsel were constitutionally deficient for failing to move to suppress his taped confession under *Minnick v. Mississippi*, 498 U.S. 146 (1990), on the ground that Hoffner had requested counsel before giving the confession. The only evidence Hoffner offers in support of this claim is his own affidavit, which states that he had requested an attorney before being interrogated and that trial counsel's "response was, in effect, that the denial of my right to an attorney prior to the interrogation didn't matter." This self-serving affidavit carries little weight, especially in light of the copious evidence in the record to contradict it. The transcripts of Hoffner's statements to the police reveal that he was advised of his *Miranda* rights, voluntarily waived those rights, and chose not to request an attorney prior to interrogation. At the suppression hearing before the trial court, the investigating officers both testified that Hoffner never requested to speak to an attorney. Counsel's decision not to pursue suppression of Hoffner's confession was not unreasonable, nor was appellate counsel's decision not to argue trial counsel's ineffectiveness on these grounds. We affirm the district court's denial of this sub-claim on the basis that it was procedurally defaulted.

V.

Hoffner's third ground for relief—ineffective assistance of counsel at the penalty phase—is based on three allegations. First, Hoffner claims that trial counsel deficiently advised him to show no emotion throughout the proceedings, thus dehumanizing him in the jurors' eyes. Second, Hoffner argues that counsel ceased functioning as his advocate at closing argument when counsel cast Hoffner in a negative light instead of arguing for

mitigation.  Third, Hoffner claims that counsel were deficient in failing to object to the court's response to a jury question requesting the definition of a "preponderance."  We find that the state courts' resolutions of the first two claims were not an unreasonable application of federal law and therefore affirm the district court's denial of *habeas* relief on these grounds.  Hoffner has defaulted his third argument and we therefore affirm the district court's rejection of that claim as well.

A.

Hoffner claims that trial counsel advised him to show no emotion "throughout the entire trial" and specifically during his unsworn statement in the mitigation phase. He claims that this adversely affected his chances of avoiding the death penalty because it "dehumanized [him] to the jury."  In support of this claim, he offers the affidavit of juror Eve Gimple.  The affidavit states that  the jury "wanted to know why Mr. Hoffner appeared to show no emotion during his unsworn statement.  It was this lack of emotion which also was a factor in my vote to recommend the death penalty for Mr. Hoffner."

Because this claim was based on an affidavit outside the trial record, Hoffner properly raised it for the first time in his state post-conviction petition.  *See Hoffner III*, 2002 WL 31162813, at *4–5.  The Ohio Court of Appeals applied Ohio's *aliunde* rule, under which "jurors are not competent to testify about their deliberations or their mental processes during deliberations without first establishing this evidence from an outside (nonjury) source."  *Id.* at *4 (citing Ohio R. Evid. 606(B)).  Ohio courts have applied this rule to "juror testimony in postconviction proceedings where the defendant alleges ineffective assistance of counsel."  *Id.* at *5; *see also Doan v. Brigano*, 237 F.3d 722, 730 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003) (discussing the differences between the Ohio rule and its federal analogue); *State v. Hessler*, No. 01AP-1011, 2002 WL 1379249, at *8 (Ohio Ct. App. June 27, 2002) (applying the *aliunde* rule in state post-conviction proceedings to exclude consideration of a juror affidavit).  The state court ruled that "the juror was not competent to testify as to her mental processes during the trial" and rejected Hoffner's claim. *Hoffner III*, 2002 WL 31162813, at *5.

The district court found that this ruling was not an unreasonable application of constitutional law, noting also that the affidavit was weak evidence of prejudice anyway as the juror had specified that Hoffner's affect was only a "factor" but had crossed out the modifier "significant." *Hoffner VII*, slip op. at 28. We agree. The affidavit does not allege that the jury was influenced by any "extraneous" information, and therefore the juror's testimony was properly excluded from consideration by the Ohio courts. This court has previously held that there is no "constitutional impediment to enforcing" Ohio's *aliunde* rule, and Hoffner has cited no authority to the contrary. *See Brown v. Bradshaw*, 531 F.3d 433, 438 (6th Cir. 2008); *see also Tanner v. United States*, 483 U.S. 107, 117–27 (1987) (chronicling the legal history of and policy underlying Federal Rule of Evidence 606(b)). Without the affidavit, Hoffner cannot establish that trial counsel's advice regarding his demeanor was prejudicial under *Strickland*. We affirm the denial of *habeas* on this ground.

B.

Hoffner also claims that some of the comments trial counsel made during closing argument at mitigation rendered counsel's assistance constitutionally ineffective. At summation, counsel stated the following:

> This is a heinous crime, it's unbelievable. As [the prosecutor] said, I can't begin to put it into words, and it's really rather difficult.
> Please don't mistake any of my remarks as an attempt to evoke sympathy on behalf of Timothy L. Hoffner, because I don't feel any, not a bit. I feel revulsion and confusion in equal parts because of everything that we have heard, these amazingly gruesome photographs, and they're hard to look at. I've looked at them for 17 months. And how is it that one young man can find it within himself to commit an act of homicide on his friend?
> . . . .
> Please understand at the outset what I'm asking of you. There are three sentences available . . . . There is death, life imprisonment with possibility of parole after serving the first 30 full years, and then life imprisonment with the possibility of serving—or possibility of parole eligibility after serving the first 20 years. Don't even think about that. To stand before you and ask for 20 full years to the parole board is an abomination and it's an insult to you, to me and to the Hammers.

(JA at 73.)   Hoffner claims that, through these comments, "trial counsel essentially ceased functioning as Hoffner's advocate during the penalty phase" and "failed to subject the prosecution's penalty case to meaningful adversarial testing" in violation of his Sixth Amendment rights.  *See United States v. Cronic*, 466 U.S. 648, 659 (1984).

The Ohio Supreme Court "determine[d] that defense counsel's comments do not reflect deficient performance and that they were not prejudicial.   Rather than an abandonment of Hoffner's mitigation defense, counsel's comments were an apparent attempt to acknowledge the particularly gruesome nature of the crime and to preserve credibility between counsel and the jury."  *Hoffner II*, 811 N.E.2d at 57.   The court applied "highly deferential" scrutiny to "the strategic decisions of trial counsel" under *Strickland* and reasoned that trial counsel "apparently believed that any attempt to seek the lesser sentence of life with the possibility of parole after 20 years would have alienated the jury."  *Id.* at 57–58.   The court concluded that the "tactic was not unreasonable in light of the particularly heinous nature of the aggravated murder committed here."  *Id.* at 58.   The district court held that the Ohio Supreme Court's decision was not contrary to or an unreasonable application of federal law and denied relief.  *Hoffner VII*, slip op. at 29–30.

We affirm the district court's ruling.   Trial counsel's comments quoted above constitute only a small portion of the entirety of the closing argument, roughly the first page and a half of the transcript.   For the remainder of the argument—approximately twenty-one transcript pages—counsel recounted at length the mitigating evidence that had been presented at the penalty phase in an attempt to prove that "there is indeed sufficient evidence to diminish the appropriateness of the death penalty."  (JA at 73.) Counsel's decision to cast Hoffner's crime in a negative light only briefly at the start of argument was clearly a strategic decision aimed at maintaining the trust of the jury.   The Ohio Supreme Court's decision to that effect was not unreasonable.

The cases Hoffner cites in support of his claim are of no avail.   Hoffner relies heavily on *Rickman v. Bell*, 131 F.3d 1150, 1160 (6th Cir. 1997), in which we held that counsel's strategy of attacking his own client constructively deprived his client of

representation to the extent that prejudice could be presumed. In *Rickman*, however, the hostility and disgust that counsel exhibited toward his client was far more extensive than in this case. Counsel's performance in *Rickman* "convey[ed] to the jurors an unmistakable personal antagonism toward Rickman, characterized both by attacks on Rickman and by repeatedly eliciting information detrimental to Rickman's interests." *Id.* at 1158. The lawyer "portray[ed] [Rickman] as crazed and dangerous" throughout the trial and "paint[ed] a picture of [his] client even more frightening than the prosecution could paint." *Id.* at 1159. We characterized the lawyer's conduct as "combin[ing] a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions." *Id.* at 1157. Not only did we find counsel's performance deficient, but we held that the deficiency was so substandard as to be presumptively prejudicial under *Cronic*. Counsel's performance here was limited to a strategic choice to gain favor with the jury by asking that Hoffner receive eligibility for parole after thirty years instead of after twenty. Counsel did not depict Hoffner as frightening or create an image of him more damaging than what the prosecution presented. *Rickman* is thus inapposite.

Hoffner also cites our decision in *Spisak v. Hudson*, 512 F.3d 852 (6th Cir. 2008), which, since oral argument in this case, has been reversed by the Supreme Court, *Smith v. Spisak*, 130 S. Ct. 676 (2010). In *Spisak*, counsel "described his client's acts in vivid detail," "argued that his client deserved no sympathy for his actions," and "[a]t no point . . . endeavor[ed] to direct his negative statements about his client toward an express appeal for leniency." *Id.* at 692 (Stevens, J., concurring in part and concurring in the judgment). However, the Court unanimously held that counsel's actions were not prejudicial in light of the context in which the argument was made. *Id.* at 687 (majority opinion). The Court reasoned that, because evidence from the guilt phase was still fresh in the jurors' minds, because counsel made repeated appeals to the jurors' sense of humanity, and because the testimony of the defense's mental health experts had presented many of the arguments for mitigation, it could not find a reasonable probability that the result of the case would have been different had closing argument been more persuasive. *Id.*; *see also id.* at 693 (Stevens, J., concurring in part and

concurring in the judgment) ("In my judgment even the most skillful of closing arguments—even one befitting Clarence Darrow—would not have created a reasonable probability of a different outcome in this case.").

Even if we were to find counsel's performance deficient in this case, under *Spisak* we could not find it to have prejudiced Hoffner's defense. Hoffner's counsel only referred to the heinous nature of his client's acts; he did not go into "vivid detail" or argue that Hoffner deserved "no sympathy." Further, counsel spent substantial time presenting a case for leniency. When viewed in light of the extensive evidence of the crime produced at the guilt phase of trial and the substantial mitigating evidence produced at the penalty phase, we can hardly find counsel's comments here to be prejudicial. Our decision is only bolstered by the deference due under AEDPA to the Ohio Supreme Court's determination of this issue. We therefore affirm the district court's denial of *habeas* on this sub-claim.

## C.

Finally, Hoffner argues that trial counsel was ineffective at the penalty phase for failing to object to the trial judge's definition of a "preponderance," which was given in response to a question from the jury during deliberations. Hoffner claims that counsel should have requested "an additional instruction to make clear that the jury knew the prosecution carried the ultimate burden of proving that the aggravating factors outweighed the mitigating factors 'beyond a reasonable doubt.'" According to Hoffner, counsel's failure to do so was constitutionally deficient because "the Sixth Amendment requires a criminal defense attorney to remain an 'active advocate' on behalf of his or her client." Appellant Br. at 46 (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985)).

Hoffner raised this claim for the first time in his state post-conviction petition. The Ohio Court of Appeals held that, because this claim could have been brought solely on the basis of the trial record, it was barred by *res judicata*. *Hoffner III*, 2002 WL 31162813, at *5. Therefore, this claim is procedurally defaulted. Hoffner claims in a footnote in his reply brief that ineffective assistance of appellate counsel excuses his

default but, on appeal, he has not developed any argument for why counsel's error here was prejudicial, and, thus, his claim fails.**3**

We affirm the district court's denial of *habeas* relief for ineffective assistance of trial counsel at the penalty phase.

## VI.

In his fourth claim for relief, Hoffner contends that appellate counsel's failure to raise various meritorious issues on appeal amounted to constitutionally deficient performance. On appeal, Hoffner points to four issues in particular that appellate counsel should have raised: (1) that the trial court failed to define the term "aggravating circumstances" in the jury instructions; (2) that the prosecution committed misconduct by arguing that the nature and circumstances of the case were to be considered as aggravation; (3) that the trial court's jury instruction as to the process of weighing mitigating and aggravating factors was faulty; and (4) that trial counsel was ineffective for failing to object to the above errors.

Under Ohio law, a claim of ineffective assistance of appellate counsel must be raised as part of an Ohio Appellate Rule 26(B) motion to reopen an appeal before the Ohio Court of Appeals. *State v. Murnahan*, 584 N.E.2d 1204, 1209 (Ohio 1992); Ohio R. App. 26(B). Rule 26(B)(1) requires that the "application for reopening shall be filed . . . within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." The Ohio Court of Appeals' decision on Hoffner's direct appeal was journalized on March 23, 2001, but Hoffner did not file his Rule 26(B) application until June 6, 2006. The Ohio Court of Appeals thus found Hoffner's application to be "untimely on its face" and dismissed it. *Hoffner IV*, slip op. at 2. The court further rejected his attempts to establish cause for the late filing and his challenge to the constitutionality of the rule. *Id.* at 2–3. Despite this ruling, however, the court of appeals proceeded to address each of Hoffner's ineffective-assistance-of-

---

**3**Before the district court, Hoffner pointed to the affidavit of juror Eve Gimple, but he has not done so here.

appellate-counsel claims and rejected them all on their merits. *Id.* at 4–15. On appeal, the Ohio Supreme Court affirmed the dismissal of the 26(B) application on untimeliness grounds only. *Hoffner V*, 860 N.W.2d at 1022–23.

This court's precedents guide our application of the *Maupin* test for procedural default when a Rule 26(B) motion has been denied for untimeliness. By the time Hoffner filed his Rule 26(B) motion in June 2006, "it was well established that claims of ineffective assistance of appellate counsel must be raised in a motion for reconsideration before the Ohio Court of Appeals." *Monzo v. Edwards*, 281 F.3d 568, 577 (6th Cir. 2002) (considering whether Rule 26(B) was an independent and adequate state procedural rule as of May 1998). Since at least 1996, Ohio law has provided sufficient guidance on what constitutes a "good cause" for a late filing under Rule 26(B). *Id.* at 578. Furthermore, as of January 1996, "the time constraints of Rule 26(B) were firmly established and regularly followed." *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008) (discussing *Fautenberry v. Mitchell*, 515 F.3d 614, 641 (6th Cir. 2008)) (emphasis omitted). Although we have, in prior cases, found Rule 26(B) not to be an adequate and independent ground on which to find procedural default, those precedents are not applicable here because Rule 26(B) was firmly established and regularly followed by June 2006.[4] *See id.* at 862 (applying the "firmly established and regularly followed" requirement "as of the time Rule 26(B) was to be applied"). Thus, we conclude that Hoffner has procedurally defaulted his claims of ineffective assistance of appellate counsel. Nevertheless, even if Hoffner's claims were not defaulted, each fails on the merits. *See Fautenberry*, 515 F.3d at 642 (analyzing the merits of a procedurally defaulted claim in the alternative).

The usual two-pronged analysis of ineffective-assistance claims under *Strickland* also governs claims of ineffective assistance of appellate counsel. *Robbins*, 528 U.S. at 285. Thus Hoffner must demonstrate that appellate counsel's decision not to raise the

---

[4]For this reason, Hoffner's reliance on *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006), is misplaced. In *Franklin*, the Rule 26(B) motion was filed on June 30, 1993, one day before Rule 26(B) went into effect. *Id.* at 418. We determined that applying Rule 26(B)'s timeliness requirement to cases filed before the effective date of the rule would give the rule impermissible retroactive effect, a holding with no application to Hoffner's case. *Id.* at 420.

issues raised here was "below an objective standard of reasonableness" and that the deficiency caused a "reasonable probability" that "the result of the proceedings would have been different." *Strickland*, 466 U.S. at 688, 694. "It is not required that an attorney argue every conceivable issue on appeal." *Jones v. Barnes*, 463 U.S. 745, 749 (1983) (citation and quotation marks omitted). Rather, appellate counsel must "examine the record with a view to selecting the most promising issues for review." *Id.* at 752. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Robbins*, 528 U.S. at 259 (citation and quotation marks omitted).

Because we are reviewing these claims under AEDPA, we must give the appropriate deference to "the last state court to issue a reasoned opinion on the issue." *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005); *see also Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (citing *Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter.")). Further, we give AEDPA deference to a ruling on the merits despite the fact that the reasoning was given as an alternative to a primary ground for decision—in this case, the court of appeals's dismissal of the Rule 26(B) application as untimely. *See Brooks v. Bagley*, 513 F.3d 618, 625 (6th Cir. 2008). Therefore, we will review the Ohio Court of Appeals's determination of the merits of the claims Hoffner raises here and accord that decision the appropriate deference under AEDPA.

## A.

Hoffner first argues that appellate counsel were deficient for failing to argue that the trial court erred by failing to instruct the jury on the meaning of "aggravating circumstances." Without a proper definition, Hoffner claims, the jury was left "with untrammeled discretion to impose or withhold the death penalty." Appellant Br. at 49–50 (citing *Gregg v. Georgia*, 428 U.S. 153, 196 n.47 (1976)). The Ohio Court of Appeals rejected the claim, relying on a prior case in which the exact same argument was raised and rejected. *Hoffner IV*, slip op. at 5–6. In *State v. Hutton*, the Ohio

Supreme Court held that appellate counsel's decision not to argue that the trial court erred by not including a definition of "aggravating circumstances" was reasonable, especially considering the fact that, because trial counsel had not objected to the instructions, plain error review would have applied on appeal. 797 N.E.2d 948, 958–59 (Ohio 2003). The court cited *Robbins* and *Barnes* and held that appellate counsel's decision not to raise the issue was not unreasonable. *Id.* at 959. Applying *Hutton* to Hoffner's claim, the Ohio Court of Appeals concluded that counsel's decision not to argue for the need for a definition of "aggravating circumstances" did not constitute deficient performance, as the issue was not "clearly stronger" than the numerous other issues counsel did raise, including other alleged defects in the jury instructions. *See Hoffner IV*, slip op. at 5–6.

Relying primarily on the same cases, the district court held that the Ohio Court of Appeals's decision was not an unreasonable application of federal law. *Hoffner VII*, slip op. at 36. We agree. Trial counsel's failure to object to the jury instructions meant that plain error review would have applied; appellate counsel's decision not to raise a waived issue was reasonable. Furthermore, as the district court explained, the Ohio Supreme Court's reweighing of the mitigating and aggravating factors would effectively cure any error caused by an improper definition of "aggravating circumstances." *See id.* at 36–37 (citing *Slagle v. Bagley*, 457 F.3d 501, 521 (6th Cir. 2006)). Moreover, Hoffner cannot show that, even if appellate counsel was deficient for not having raised the claim, the result of the proceeding would have been different. Hoffner argues that the failure to provide this instruction was a "structural" defect in the trial under *Arizona v. Fulminante*, 499 U.S. 279, 309–310 (1991). This is a mischaracterization of the trial court's omission. Structural defects affect "the framework within which the trial proceeds" and are not simply errors in the trial process itself, *see id.*, such as a faulty jury instruction is. The Ohio court's resolution was not unreasonable. We affirm the district court's rejection of this sub-claim.

B.

Next, Hoffner claims that the prosecutor made several comments during closing argument at the penalty phase that improperly represented that the nature and circumstances of the offense could be considered an aggravating factor.  At closing argument, the prosecutor stated:

> Archie Dixon went through Chris' wallet and later both Mr. Hoffner and Mr. Dixon took and sold Chris' car.  I don't think there's any question there's an aggravating circumstance, *maybe more than one here*.
>
> Is there anything mitigating about the nature of circumstance of this crime?  Is there anything mitigating, ladies and gentlemen, about trying to snap someone's neck, trying to snap his neck, leaving, digging a hole, coming back, walking him to the car, driving him there with other people, walking him down a path and taking him to his grave, is there anything mitigating about that? . . .
>
> Who benefited in this murder?  I think the evidence is clear that Mr. Hoffner and Mr. Dixon sold Chris Hammer's car.  He bought at least one car, and there are a couple of exhibits, State's Exhibit's, after the taking and selling of Chris Hammer's car, and then he initially lied to the police and blamed everything on Archie Dixon.  *Is there anything mitigating about the nature and circumstances of this crime, a planned, premeditated, calculated killing?*

(emphasis added by Hoffner).  Hoffner claims that these statements "allowed the jury unbridled discretion to consider any number of non-statutory aggravating factors." Appellant Br. at 51 (citing *Zant v. Stephens*, 462 U.S. 862, 878 (1983)).

The Ohio Court of Appeals once again conducted plain-error review, as Hoffner's counsel had not objected at trial.  *Hoffner IV*, slip op. at 8.  As to the prosecutor's first comment, the state court reasoned that although "the prosecutor's reference to 'more than one' aggravating circumstance technically may have been improper[,] . . . '[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning.'" *Id.* at 9 (quoting *State v. Ahmed*, 813 N.E.2d 637, 662 (Ohio 2004)).  As to the remainder of the statements, the court held that the remarks properly stated the law.  Under Ohio law, the facts and circumstances of the offense must be examined to determine whether they are mitigating.  Ohio Rev. Code

Ann. § 2929.04(B). "Thus, a prosecutor may legitimately refer to the nature and circumstances of the offense, both to refute any suggestion that they are mitigating and to explain why the specified aggravating circumstance[s] outweigh mitigating factors." *State v. Sheppard*, 703 N.E.2d 286, 294 (Ohio 1998). Therefore, the court of appeals reasoned, the prosecutor was justified in arguing to the jury that the nature and circumstances of Hoffner's crime should not be considered mitigating, and appellate counsel was not deficient for failing to raise the claim. *Hoffner IV*, slip op. at 10–11.

We agree with the district court that this conclusion was not an unreasonable application of federal law. The prosecutor's statements could hardly qualify as prosecutorial misconduct under Ohio law as they accurately reflected Ohio's rules on the use of aggravating and mitigating evidence. Therefore, appellate counsel's failure to raise the claim on appeal could not have been deficient, especially considering the plain-error review to which the claim would have been subject. We affirm the district court's decision on this sub-claim.

## C.

Hoffner also argues that the trial court's instructions to the jury were erroneous in their explanation of the process by which the jury should weigh aggravating and mitigating evidence. First, he claims that the court omitted an instruction that the jury need not reach a unanimous decision as to the existence of any mitigating factor. The instructions read: "If the weight of the evidence is equally balanced, or if you are unable to determine which side of an issue has the preponderance as to any one or more of the mitigating factors, then the defendant has not established that mitigating factor or factors as the case may be." Hoffner argues that this instruction could have led the jurors to believe that they could not consider a mitigating factor unless all the jurors believed it had been proven, in violation of *Mills v. Maryland*, 486 U.S. 367, 384 (1988).

The Ohio Court of Appeals rejected this claim, concluding that the trial court in fact was properly instructing the court as to the defendant's burden to prove a mitigating circumstance by a preponderance, which is constitutionally valid. *Hoffner IV*, slip op. at 12 (citing *State v. Tenace*, 847 N.E.2d 386, 397 (Ohio 2006)). In a prior case, we held

that "requiring unanimity as to the presence of a mitigating factor"—a process prohibited by *Mills*—is a "far different matter" than requiring unanimity as to the results of the weighing. *Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998) (emphasis omitted). Similarly, it is a far different matter than emphasizing that the defendant carries the burden of proving mitigating factors by a preponderance. "[F]ailing to expressly state that mitigating factors need not be unanimously found does not improperly imply that mitigating factors must be unanimously found." *Williams v. Anderson*, 460 F.3d 789, 808 n.5 (6th Cir. 2006). We affirm the district court's finding that the court of appeals's resolution of this sub-claim was not unreasonable.

Second, Hoffner contends that the district court erred by instructing the jury that it could consider penalties other than death only after finding that the prosecution failed to prove that the aggravating factors did not outweigh the mitigating factors. Hoffner does not cite a particular portion of the jury instructions where the trial court made such an error, but we will assume that he is referring to the same passage that he cited in his Rule 26(B) application. The instructions read:

> If after a full and impartial consideration of all the evidence in this case you are firmly convinced that the aggravating circumstances outweigh the mitigating factors, then the State has established this beyond a reasonable doubt and your sentence recommendation should be death.
> If you are not firmly convinced that the aggravating circumstances outweigh the mitigating factors, then your sentence recommendation must be life imprisonment with parole eligibility only after either 20 full years of imprisonment or 30 full years of imprisonment.
> . . . .
> Now, in conclusion, as you shall recommend the sentence of death only if you unanimously, all 12 jurors, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not so find, you should unanimously recommend either a life sentence with parole eligibility after serving 20 full years of imprisonment or a life sentence with parole eligibility only after serving 30 full years of imprisonment.

Hoffner claims that this instruction was faulty in requiring the jury to reject the death penalty before considering another option and that counsel was ineffective for failing to

raise the claim.  Appellant Br. at 56 (citing *Mapes v. Coyle*, 171 F.3d 408, 416–17 (6th Cir. 1999)).

The Ohio Court of Appeals distinguished the instructions given here from an Ohio Supreme Court case prohibiting "acquittal-first" instructions.  *Hoffner IV*, slip op. at 13–14.  In *State v. Brooks*, 661 N.E.2d 1030, 1042 (Ohio 1996), the Ohio Supreme Court "h[eld] that the jury need not unanimously reject the death penalty in order to recommend a life sentence."  *State v. Murphy*, 747 N.E.2d 765, 793 (Ohio 2001).  But the instruction given in *Brooks*—"You are now required to determine unanimously that the death penalty is inappropriate before you can consider a life sentence," *Brooks*, 661 N.E.2d at 1040—is clearly distinguishable from the instructions in this case, which "state nothing about unanimously rejecting the death penalty nor do they state anything about the order in which the jury should proceed," *Hoffner IV*, slip op. at 14.

We agree with the Ohio Court of Appeals that counsel was not deficient for failing to raise this state claim as the claim itself was meritless under Ohio precedent. The claim would have also failed under federal law.  As it recently noted, the Supreme Court "ha[s] not . . . previously held jury instructions unconstitutional" for requiring rejection of the death penalty first.  *Spisak*, 130 S. Ct. at 684.  The jury instructions here are substantively congruent to those in *Spisak*, in which the Court held the instructions not to be contrary to clearly established Supreme Court precedent.  *Id.*  The Ohio court's conclusion was not an unreasonable application of federal law, and we affirm the district court on this sub-claim.

## D.

Finally, Hoffner claims that appellate counsel was ineffective for failing to raise a claim that trial counsel was ineffective for failing to object to the errors discussed here. Because we find none of the alleged underlying errors to be meritorious, trial counsel was not ineffective for failing to object.  Therefore, appellate counsel's failure to raise the ineffective assistance issue was not constitutionally deficient.  The Ohio Court of Appeals reached the same conclusion.

We therefore affirm the district court's denial of *habeas* on Hoffner's claim of ineffective assistance of appellate counsel.

## VII.

In his fifth claim for relief, Hoffner contends that the police questioning that led to his arrest was conducted in violation of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that the trial court erred by failing to suppress the statements. Hoffner argues that the atmosphere at the house where he was initially questioned by the police was such that it constituted custodial interrogation necessitating a *Miranda* warning. According to Hoffner, because the police failed to give the warning at that time, later statements given in the police car and at the police station were so tainted that a mid-interrogation *Miranda* warning could not cure the violation. Appellant Br. at 60–61 (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)).

Hoffner properly preserved this issue for our review by raising it on direct appeal. *See Hoffner II*, 811 N.E.2d at 52. Under AEDPA, factual findings made by the state courts based on the trial record are entitled to a presumption of correctness that may be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren*, 161 F.3d at 360–61. The Ohio Supreme Court made extensive factual findings on this issue:

> {¶ 17} On November 9, 1993, Hoffner and Dixon were living at Wilkerson's house. At approximately 11:00 a.m. on that date, Toledo police officers executed a search warrant at the Wilkerson residence and arrested Dixon for forgery.
>
> {¶ 18} During the search, Lieutenant Charles Hunt discovered Hoffner covered with a blanket lying on a couch in the family room. Hunt, with his weapon drawn but pointed in the air, ordered Hoffner off the couch. Hunt then pulled the blanket away from Hoffner, holstered his weapon, and searched Hoffner for weapons. To prevent Hoffner from interfering while police searched the premises, Hunt asked Hoffner to sit in a nearby chair.
>
> {¶ 19} Hunt and Detective Robert Leiter then searched the family room. During their search, the detectives asked Hoffner whether he knew anything about Hammer's disappearance. Hoffner denied all knowledge of Hammer's whereabouts.

{¶ 20} After Hunt and Leiter completed their search of the family room, Hoffner asked to speak with them. Hoffner told police that Dixon and Hammer had gotten into an argument and that Dixon had "[taken] care of him," had buried Hammer's body in the woods, and had sold Hammer's car. At no point did Hoffner implicate himself.

{¶ 21} Once Hoffner had implicated Dixon, Hunt and Leiter asked whether Hoffner would go downtown to make a statement. Hoffner agreed. On the drive to the police station, Leiter told Hoffner that officers would begin searching the wooded area where Hoffner had said Hammer's body was buried and that any other information Hoffner had would be helpful. Leiter again asked whether Hoffner had had anything to do with Hammer's disappearance, and Hoffner said he had not. Hoffner subsequently asked the detectives to stop the car and indicated that he had additional information but said he did not want to get into trouble. Leiter told Hoffner that he could be charged with obstruction if he withheld information, but if he told the truth and was not involved in any crimes, he had nothing to worry about. At that point, Hoffner told the detectives where they could find Hammer's body.

{¶ 22} After leading the detectives to Hammer's grave, Hoffner again agreed to go to the police station to give a statement. On the way to the station, the detectives stopped at a fast-food restaurant, and Hoffner was given food and a drink. At the station, Leiter advised Hoffner of his *Miranda* rights but did not arrest him. Hoffner confirmed that he understood his rights and signed a waiver-of-rights form. At approximately 3:30 p.m., Hoffner gave a taped statement describing Dixon's murder of Hammer. After the interview, Leiter and Detective Phil Kulakoski drove Hoffner back to Wilkerson's house. Hoffner then packed his belongings and drove himself to his mother's house in Perrysburg.

{¶ 23} At approximately 7:30 p.m. on November 9, Dixon confessed to Hammer's murder and, in the process, implicated Hoffner. Shortly thereafter, police obtained an arrest warrant for Hoffner. After midnight on November 10, Kulakoski and Leiter arrested Hoffner at his mother's house.

{¶ 24} Detectives drove Hoffner to the police station, where they again read him Miranda warnings. Hoffner signed a waiver-of-rights form and gave a taped statement confessing to Hammer's murder.

*Hoffner II*, 811 N.E.2d at 52–53.

Addressing Hoffner's claim, the Ohio Supreme Court began by explaining that "*Miranda* warnings are not required simply because the questioning takes place in a

coercive atmosphere." *Id.* at 54 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). Rather, the court undertook analysis under *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), and *California v. Beheler*, 463 U.S. 1121, 1125 (1983), to determine whether Hoffner would have felt that he was not at liberty to terminate the interview and leave. The court found that the police's initial questioning regarding Hammer's whereabouts consisted of "[g]eneral on-the-scene questioning" not subject to the *Miranda* warning requirement. *Hoffner II*, 811 N.E.2d at 54 (quoting *Miranda*, 384 U.S. at 477). Further, the court found "no evidence that police officers coerced Hoffner into making any statements"; rather, Hoffner "voluntarily offered information that Dixon had killed Hammer." *Id.* (citing *Miranda*, 384 U.S. at 478). The court held that the police's initial instructions to Hoffner to stay in a specific location were reasonably necessary to secure the scene and did not place Hoffner in custody. *Id.*

The court also found that events after Hoffner left the Wilkerson house in the police vehicle did not constitute custodial interrogation. According to the Ohio Supreme Court, "Hoffner voluntarily agreed to go to police headquarters to give a taped statement. On the way to the station, Hoffner offered to direct police to the location of Hammer's body." *Id.* at 55. The court reasoned that "[b]ecause Hoffner was not under arrest or in custody . . . , police were not required to issue *Miranda* warnings." *Id.* As to the interrogations at the police station occurring both before and after his arrest, the court found that, in both instances, Hoffner voluntarily waived his *Miranda* rights in writing. *Id.* Therefore, the court concluded that "[a]ll of Hoffner's statements regarding Hammer's disappearance and murder were voluntarily made and properly admitted at trial." *Id.*

The district court found that "the Ohio Supreme Court correctly identified and reasonably applied federal precedent to this case's facts" and therefore denied *habeas* relief on this claim. *Hoffner VII*, slip op. at 53–54.

Hoffner argues that this was an unreasonable application of Supreme Court precedent. He claims that the initial questioning at the Wilkerson house was custodial because he was not free to leave after ten officers entered Wilkerson's house, and at least

one officer pointed a gun at him and ordered him to stay in one place. He maintains that the questions he was asked at that point regarding Hammer's disappearance constituted interrogation. Hoffner argues that, because he gave incriminating statements to the police shortly thereafter and because his custody with the police was continuous until the time he gave his first statement, he could not have reasonably perceived the later questioning to be "new and distinct," which would have dissolved the taint of the earlier *Miranda* violation. Finally, he claims that the officers failed to ensure that, at the time he gave his confession, his earlier pre-*Miranda* statements could not be used against him, thus violating *United States v. Pacheco-Lopez*, 531 F.3d 420 (6th Cir. 2008).

The procedural safeguards outlined in *Miranda* apply only to suspects subject to "custodial interrogation." *Miranda*, 384 U.S. at 444. This term was defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he only relevant inquiry" for determining whether an individual is in custody "is how a reasonable man in the suspect's position would have understood his situation." *Berkermer v. McCarty*, 468 U.S. 420, 442 (1984). This requires that we resolve two questions: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Keohane*, 516 U.S. at 112 (footnote omitted). "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda*]." *Miranda*, 394 U.S. at 478.

We find that the Ohio Supreme Court's ruling was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The circumstances surrounding the beginning of Hoffner's interaction with the police do not reflect any form of coercion or custody. Hoffner was present at Wilkerson's house when the police burst into the house to execute a search warrant. However, as the Ohio Supreme Court recognized, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected

by [the] holding [in *Miranda*]." *Id.* at 477. Thus, the police did not need to give Hoffner *Miranda* warnings upon entering the house in order to ask basic investigatory questions. Hoffner's claim that the fact that one officer pointed a gun at him is unavailing as Hoffner made each of his statements incriminating Dixon entirely voluntarily and not in response to police questioning. At Wilkerson's house, Hoffner approached the officers to inform them that he had information as to Hammer's whereabouts. Hoffner then volunteered to go to the police station to give a statement. In the police vehicle on the way to the station, Hoffner volunteered that he knew the location of Hammer's body. Hoffner walked to Hammer's gravesite voluntarily, without coercion by the police officers. As noted above, volunteered statements do not implicate *Miranda*'s protections. Further, Hoffner was properly Mirandized and waived his rights in writing before he gave his official statement at the police station. The same proper procedures preceded his eventual confession. Therefore, the Ohio Supreme Court correctly concluded that each of Hoffner's statements complied with the requirements of *Miranda* and its progeny.

As to Hoffner's argument that his earlier statements tainted his later taped confession, because none of the statements violated *Miranda* on its own, none of them can taint any later statements. *Cf. Seibert*, 542 U.S. at 606. In any event, the facts of *Seibert* are easily distinguishable from this case. In *Seibert*, police had developed a protocol whereby they would interrogate a suspect, gain incriminating information, then give the proper *Miranda* warnings and re-question the suspect covering the same ground. *Id.* at 604. The Supreme Court held that this technique rendered the *Miranda* warnings "ineffective," *id.* at 611, and "likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them,'" *id.* at 613–14 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)) (alteration in original). Nothing in the facts of this case remotely resemble the police protocol invalidated in *Seibert*. In fact, Hoffner's case is much more similar to *Oregon v. Elstad*, 470 U.S. 298, 300–01 (1985), in which a suspect was questioned without proper warnings at his home, made an incriminating statement, then was taken to the police station, properly warned, waived his rights, and made a full

confession. The Supreme Court held that the confession was admissible because no taint attached to an incriminatory statement given without "any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Id.* at 309. The initial unwarned statement was suppressed, but all later statements were subject to the standard voluntariness inquiry. *Id.*

The Ohio Supreme Court's application of federal law in affirming the admission of Hoffner's statements was thus reasonable. We therefore affirm the district court's denial of the writ on this ground.

## VIII.

In his last assignment of error, Hoffner claims that the prejudicial effect of the various errors that we have individually rejected become, in the aggregate, a constitutional violation. First, Hoffner has defaulted this issue by not raising it on direct appeal. Although he did argue cumulative error in his post-conviction petition, *see Hoffner III*, 2002 WL 31162813, at *6, that claim involved a substantially different set of underlying claims and thus does not preserve the issue for our review. Even so, as Hoffner recognizes in his brief, we have previously held that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *see also* Appellant Br. at 74 n.3. We therefore affirm the district court's denial of *habeas* relief on this claim.

## IX.

For the reasons discussed above, we affirm the judgment of the district court and deny Hoffner's petition for a writ of *habeas corpus*.