*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

MARK E. STOREY,

    *Petitioner-Appellant,*

    *v.*

No. 09-2301

DOUGLAS VASBINDER,

    *Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 06-13194—John Corbett O'Meara, District Judge.

Argued: January 13, 2011

Decided and Filed: September 16, 2011

Before: KENNEDY, CLAY, and KETHLEDGE, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Mary A. Owens, Grand Rapids, Michigan, for Appellant. John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Mary A. Owens, Grand Rapids, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

    KETHLEDGE, J., delivered the opinion of the court, in which KENNEDY, J., joined. CLAY, J. (pp. 13–33), delivered a separate dissenting opinion.

—————————————

## OPINION

—————————————

    KETHLEDGE, Circuit Judge. Mark Storey's principal argument in his federal habeas petition is that he should get a new trial because his lawyer in his first trial was ineffective. It is common ground in this case that Storey's trial lawyer did a poor job.

But the Supreme Court has gone out of its way to make clear that, in order to obtain a new trial on ineffective-assistance grounds, the petitioner must do more than show that he had a bad lawyer—even a really bad one.  Instead, the petitioner must also show prejudice, which means he must show a reasonable likelihood that his lawyer's bad performance made a difference in the outcome of his trial.  The Court's precedents make clear that the former showing by no means leads inevitably to the latter.

Whether a petitioner can show prejudice depends in large part on the evidence in the case.  The evidence here included the testimony of three witnesses who testified that, on separate occasions, Storey had boasted to them about killing Nathan Wilson.  There is little likelihood that even an effective defense lawyer could have overcome that testimony, if indeed the trier of fact found it credible.  The trial judge who watched each of these witnesses testify specifically found their testimony to be credible on this point.  Another trial judge who watched two of these witnesses change their testimony, in a hearing over a decade later, specifically found their recantations *not* to be credible.  And so, in the end, Storey's petition asks us to set aside the credibility determinations of the two judges who watched these witnesses testify first-hand, in favor of contrary credibility determinations of our own.  The record provides us with no basis to take that extraordinary step in this case.  We therefore affirm the district court's denial of the writ.

I.

A.

Wilson worked at the Gold Mine, a Detroit gold and jewelry shop that also reputedly did its share of fencing.  A bulletproof plexiglass partition and a sliding-steel door separated the customer counter from the employee-only area of the store.  The store's inventory was displayed in a see-through case on the employee side of the partition.  A loaded .357 Magnum revolver typically rested in plain view on top of the case.

Sometime between 2 and 3 p.m. on November 7, 1984, Wilson was found dead in his chair behind the plexiglass at the shop.  He had been shot three times in the back

of the head.  One shot was made with the gun pressed directly against his head.  The sliding steel door was open.  About $10,000 worth of jewelry, $1,000 cash, and the .357 Magnum were missing from the store.

Mark Storey later admitted that he was in the employee-only area of the store between approximately 1 and 2 p.m. on the day of the shooting.  He said that Wilson let him in, along with his friend Shawn Coats, so that Storey could sell some stolen jewelry to the store.  Storey and Coats smoked marijuana while they were back there.

About three weeks later, Storey tried to sell the store a gold necklace.  The store's owner, James Floyd, recognized the necklace as one that had been stolen when Wilson was murdered.  The police investigated.  Eventually, in connection with Wilson's killing, the State of Michigan charged Storey with first-degree murder and firearm possession during a felony.

## B.

Storey was just shy of 16 years old on the date of the murder, so the Wayne County Probate Court's Juvenile Division initially held jurisdiction over his case.  But that court waived jurisdiction at the State's request, thereby sending the case to the Michigan Recorder's Court for Storey to be tried as an adult.  Neither Storey's counsel at the time, nor his counsel at trial, Charles Campbell, appealed the waiver.

After a four-day bench trial in the Recorder's Court, Judge James Chylinski found Storey guilty beyond a reasonable doubt on both counts.  He emphasized that "the crux of the case" was whether three witnesses—Darin Henderson, David Kidd, and William Walls—were credible when they testified that Storey had told them that he killed Wilson.  And Judge Chylinski found that each of these witnesses was credible when he so testified.  He sentenced Storey to life in prison, plus two years for the gun charge.  Storey appealed, claiming only that the evidence was insufficient to convict him.  The Michigan Court of Appeals affirmed the trial court's judgment, and the Michigan Supreme Court denied leave to appeal.

Storey then pursued state collateral remedies. First he filed a petition for habeas corpus in the Recorder's Court, which Judge Chylinski denied in 1989. Five years later, Storey filed a motion for relief from judgment in the same court, claiming for the first time that his trial counsel had been ineffective, among other claims. He also moved for an evidentiary hearing with respect to his ineffective-assistance claim. *See generally People v. Ginther*, 212 N.W.2d 922 (Mich. 1973). By then Judge Harvey Tennen had replaced Judge Chylinski. Judge Tennen granted the motion for a *Ginther* hearing, at which a criminal-defense lawyer offered expert testimony that Campbell had done a poor job before and during trial.

Judge Tennen thereafter ordered a new trial based on Campbell's failure to prepare adequately for trial and to obtain discovery regarding the State's witnesses. But the State appealed, and the Michigan Court of Appeals promptly remanded the case for a determination as to whether Storey had shown cause for failing to present his ineffective-assistance claim on direct appeal. On remand, Judge Tennen found that Storey had not shown cause for that failure, so he vacated his earlier order and denied Storey's motion for a new trial.

Storey then filed two applications for leave to appeal to the Michigan Court of Appeals. The first application included a claim that the Juvenile Division's waiver of jurisdiction had been procedurally defective. The Court of Appeals denied that application in a stock order entered under Michigan Court Rule 6.508(D). The second application included a claim that Campbell had been ineffective as a result of his failure to challenge the juvenile-waiver order. In addition, that application challenged Judge Tennen's determination that Storey had not shown cause for his failure to present a claim of ineffective assistance in his direct appeal. The Court of Appeals denied that application for lack of merit. The Michigan Supreme Court denied leave to appeal from either denial.

In 1999, Storey filed a second motion for relief from judgment before the state trial court. This motion included a new claim that two of the State's witnesses at his trial—Henderson and Kidd— had perjured themselves when they testified that Storey

had told them he shot Wilson. Judge Tennen held another *Ginther* hearing with respect to the motion. Although both Henderson and Kidd recanted their trial testimony during the hearing, Judge Tennen found that neither recantation was credible. Judge Tennen also held that Storey's other claims were procedurally barred. He thus denied Storey's motion for a new trial. The Michigan Court of Appeals and Michigan Supreme Court each denied leave to appeal.

## C.

Storey turned finally to the federal courts. In 2001, he filed a federal habeas petition comprising eight claims. In September 2003, the district court granted relief on one of them: that Storey's appellate counsel had been ineffective by failing to argue that Campbell had been ineffective at trial. (The 2001 petition did not itself include, however, a claim that Campbell had been ineffective.) As relief, the district court ordered that Storey be granted a new direct appeal. The district court thereafter closed the case without staying, dismissing, or otherwise taking any action with respect to Storey's other claims.

Per the district court's order, the Michigan Court of Appeals granted Storey a new appeal. Before proceeding with that appeal, however, Storey filed yet another motion for a new trial before the trial court, again presenting his ineffective-assistance and perjured-testimony claims. Judge Michael Hathaway—who was by then presiding—denied the motion, finding among other things that Judge Chylinski had been better positioned than anyone to judge each witness's credibility.

So Storey proceeded with his second direct appeal before the Michigan Court of Appeals, raising ten claims. The court rejected all of them and affirmed the trial court's original judgment. The Michigan Supreme Court denied leave to appeal.

Storey then returned to federal district court, filing a new habeas petition in 2006. That petition included several claims that were in his 2001 petition, but four that were not. One of the latter claims was that Campbell had been ineffective at trial. Based on Storey's inclusion of the new claims, however, the district court held in a June 2009

order that Storey's new petition was "second or successive" within the meaning of 28 U.S.C. § 2244(b). The district court gave Storey the choice of dropping the new claims or seeking permission from us to file a second or successive petition. *See generally id.* § 2244(b)(3). Storey did neither, and instead filed a motion for reconsideration. The district court granted the motion, reached the merits of Storey's claims, and—in an extensively reasoned opinion—rejected all of them. The court therefore denied his petition, though it did grant a certificate of appealability as to each of his claims.

This appeal followed.

## II.

### A.

A threshold question is whether Storey's 2006 petition is "second or successive" under § 2244(b) because it added claims not included in Storey's 2001 petition. If it is, we must order the petition dismissed because Storey did not obtain permission to file it. *See id.*

Whether a petition (a term we use interchangeably with "application") is "second or successive" within the meaning of § 2244(b) does not depend merely on whether the petitioner filed a prior application for habeas relief. The phrase is instead "a 'term of art' that is 'given substance' by the Supreme Court's habeas cases." *In re Salem*, 631 F.3d 809, 812 (6th Cir. 2011) (quoting *Slack v. McDaniel*, 529 U.S. 473, 486 (2000)). Accordingly, in a number of cases, the Court has held that an application was not second or successive even though the petitioner had filed an earlier one. In *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), the petitioner filed a second petition that presented a claim identical to one that had been included in an earlier petition. The claim had been unripe when presented in the earlier petition. The Court treated the two petitions as "only one application for habeas relief[.]" *Id*. at 643. In *Panetti v. Quarterman,* 551 U.S. 930 (2007), the Court held that an application that presented a claim that had *not* been presented in an earlier application, but that would have been unripe if it had been

presented then, was not second or successive. *Id*. at 945. In *Magwood v. Patterson*, 130 S. Ct. 2788 (2010), the Court made clear that an application challenging an earlier criminal judgment did not count for purposes of determining whether a later application challenging a new judgment in the same case was second or successive. *Id.* at 2797-98.

The posture of this case is somewhat different. In response to Storey's 2001 petition, the district court ordered the Michigan courts to grant him a new direct appeal. The Michigan courts did so, but ultimately affirmed the original judgment in his case. Storey filed a second petition in 2006, which included some new claims that were undisputedly ripe for inclusion in his earlier petition. The issue, then, is whether the fact of Storey's new appeal, standing alone, serves to "reset" the "counter" of his applications to zero. *In re Williams*, 444 F.3d 233, 235 (4th Cir. 2006) (internal quotation marks omitted).

There is a circuit split on this issue, though perhaps now a stale one. These cases involve applications under both §§ 2254 and 2255, though courts do not distinguish between those sections for purposes of the second-or-successive determination. *See, e.g.*, *id.* ("This court and others have repeatedly cited § 2254 and § 2255 interchangeably in such circumstances"). Seven circuits—the Second, Third, Fourth, Seventh, Ninth, Tenth, and Eleventh—hold that the tally of applications is reset to zero after the petitioner concludes a direct appeal that was ordered in response to an earlier petition. *See Urinyi v. United States*, 607 F.3d 318, 321 (2d Cir. 2010) (per curiam) (collecting cases). In those cases, as in this one, the reason why the petitioner was granted a new appeal is that his counsel was ineffective with respect to his first direct appeal; and these courts reason that such a petitioner should be given the same clean slate with respect to habeas review as a defendant whose counsel did not "bungle[]" his first direct appeal. *See, e.g.*, *In re Goddard,* 170 F.3d 435, 437 (4th Cir. 1999). The upshot of this rule is that the petitioner can eventually seek habeas relief on all of the claims presented in his remedial appeal, in which presumably he will have competent counsel. *See, e.g.*, *id*. at 437 & n.1. (One important limitation on this rule, however, is that the petitioner cannot

"resurrect" claims that the district court "denied on the merits" in his first petition. *See In re Williams*, 444 F.3d at 236.)

Two circuits—the First and the Fifth—hold that a post-remedial-appeal petition is second or successive if it includes claims that could have been included, but were not, in the first petition. *See United States v. Orozco-Ramirez*, 211 F.3d 862, 870–71 (5th Cir. 2000); *Pratt v. United States*, 129 F.3d 54, 61 (1st Cir. 1997). These courts invoke what they call "the spirit of AEDPA's restrictions[,]" and they reason that their rule "serves the singularly salutary purpose of forcing federal habeas petitioners to think through all potential post-conviction claims and to consolidate them for unitary presentation to the district court" in the first petition filed. *Pratt*, 129 F.3d at 61; *see also Orozco-Ramirez*, 211 F.3d at 870–71. To which one might respond that, in many cases, the person doing the thinking is the petitioner himself.

We think there is a reason why no circuit has adopted the minority rule since 2000: namely, the Supreme Court's decision the same year in *Slack*. Slack's first federal habeas petition included claims that had not been exhausted in state court. The district court dismissed the petition without prejudice and Slack returned to state court to exhaust those claims. He then filed in federal court a second petition that included claims not included in his first petition. That petition, the district court and Ninth Circuit held, was "second or successive" as a result of those claims. *Slack*, 529 U.S. at 479–80.

The Supreme Court reversed. As an initial matter, the Court noted that "pre-AEDPA law govern[ed]" that case, though it hastened to add that "we do not suggest the definition of second or successive would be different under AEDPA." *Id.* at 486. In any event, what matters for our purposes was the reasoning of the Court's decision:

> The State contends that the prisoner, upon his return to federal court, should be restricted to the claims made in his initial petition. Neither *Rose v. Lundy*[, 455 U.S. 509 (1982)] nor *Martinez-Villareal* requires this result, which would limit a prisoner to claims made in a pleading that is often uncounseled, hand-written, and pending in federal court only until the state identifies one unexhausted claim. The proposed rule would bar the prisoner from raising nonfrivolous claims developed in the subsequent state exhaustion proceedings contemplated by the *Rose*

dismissal, even though a federal court had yet to review a single constitutional claim.

*Slack*, 529 U.S. at 487.

This reasoning is virtually identical to that followed by the majority of circuits with respect to the question presented here. And it effectively rejects the contrary reasoning of the two circuits that follow the minority rule. It is true that, in these cases, unlike *Slack*, the district court by definition has ruled on at least "a single constitutional claim": namely, whether the petitioner is entitled to a new direct appeal. *Id.* But we think the rest of the quoted passage makes clear that, in these circumstances, the Court would not want the petitioner to be "restricted to the claims made in his initial petition[.]" *Id.* Instead, we think it clear enough that the petitioner should be able to "rais[e] nonfrivolous claims developed in the subsequent" remedial appeal. *Id.*

So it ultimately does not matter what we think, as an original matter, of the respective rationales offered by the majority and minority circuits for their rules. The Supreme Court has told us what it thinks of those rationales. Thus we join the majority of circuits, and hold that a petition filed after a remedial appeal, ordered in response to an earlier petition, is not second or successive within the meaning of § 2244(b)—even if it includes claims that could have been included, but were not, in the first petition.

Storey's 2006 petition is not second and successive. We proceed to consider its merits.

### B.

### 1.

We first consider Storey's claim that Campbell's lack of preparation and generally weak presentation at trial rendered him ineffective in the constitutional sense of the term. The Michigan Court of Appeals rejected this claim on the merits. In doing so, the court correctly recited the test for showing prejudice; but the court later concluded that Storey had not shown prejudice because he had "not demonstrated that the outcome of the trial would have been different" if Campbell had performed

effectively. *People v. Storey*, No. 251271, 2005 WL 711756 (Mich. Ct. App. Mar. 29, 2005). We need not decide whether the latter statement—which is an arguably incorrect statement of the *Strickland* standard for prejudice—requires us to review the state court's decision on this issue de novo rather than under the deferential standard set forth in § 2254(d). For Storey's claim fails even under a de novo standard of review.

*Strickland*'s test for prejudice is a demanding one. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792. So we turn to the question whether the test is met here. Broadly stated, Storey's argument is that, absent Campbell's failure to prepare for trial, obtain discovery, and uncover an alleged deal between the prosecution and David Kidd, there was a reasonable likelihood that he would have been acquitted. (Storey does not argue before us—and has never claimed in his federal habeas petitions—that Campbell was ineffective as a result of his failure to contest the juvenile-waiver order.)

We first take up the allegation regarding Kidd. "[T]he mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*." *Akrawi v. Booker*, 572 F.3d 252, 262 (6th Cir. 2009) (emphasis in original). Here, as the district court explained at considered length in its opinion denying the writ, there simply is no evidence of any such agreement between the prosecution and Kidd. All there is, rather, is Kidd's own assertions years after the trial that he "hoped" that he might get a shorter sentence for his own crimes if he testified favorably for the prosecution in Storey's trial. That is not proof of an "agreement[,]" *id.*, and thus there is no basis to fault Campbell for failing to discover one.

That leaves Campbell's failures to prepare for trial and to argue effectively once he was there. Those failures are serious, but they are simply not enough to show prejudice in this case, given the record before us. The evidence of Storey's guilt included the following: Storey's own admission that he had entered the store's employee-only area shortly before Wilson was murdered; Floyd's testimony—specifically found credible by Judge Chylinski—that Storey tried to sell

back to Floyd a gold necklace stolen in the murder-robbery; and Henderson's and Kidd's testimony that, before the murder, Storey had told each of them that it would be easy to rob the Gold Mine by getting behind the partition and then shooting Wilson.

And finally there was the testimony of three witnesses—Henderson, Kidd, and Walls—each of whom testified that Storey had told him, on separate occasions, that he shot Wilson. The judge who observed that testimony found it credible, notwithstanding Campbell's extensive cross-examinations of these witnesses; and a second judge who observed Henderson and Kidd change their stories years later found their recantations incredible. For good reason, we give "great deference" to those credibility determinations. *See Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (internal quotation marks omitted); *see also* 28 U.S.C. § 2254(e)(1). Storey makes a number of assertions about the motives of these witnesses and the extent to which the judges who assessed their credibility were aware of them; but none of those assertions meaningfully distinguish this case from the raft of habeas cases in which witnesses change their stories years after the petitioner is sent to prison. We have no lawful basis—or inclination—to displace the credibility findings of the trial judges who observed the testimony of these witnesses first-hand. And that means that Storey cannot show prejudice as the Supreme Court has defined the term. The Michigan Court of Appeals and the district court were both correct to reject this claim.

2.

We make shorter work of Storey's remaining claims. "The extent to which these claims are procedurally defaulted is a nettlesome question; the extent to which they are meritless, much less so." *Benton v. Booker*, 403 F. App'x 984, 985 (6th Cir. 2010). So we cut to the merits here.

Storey claims that his rights under various clauses of the Constitution were violated by the prosecution's non-disclosure of its alleged agreement with Kidd and by the trial court's failure to order disclosure of the agreement to Storey. Those claims fail because there is no proof that any agreement existed in the first place. Storey next

claims that the prosecution violated his *Brady* rights by failing to disclose testimony from other cases in which, he says, Kidd falsely accused other defendants of murder. That claim fails because "*Brady* does not apply when the information is available from another source," *e.g.*, by "looking at public records." *Owens v. Guida*, 549 F.3d 399, 418 (6th Cir. 2008).

Storey also claims that the judges who presided over his state collateral proceedings violated his Sixth Amendment rights by making credibility determinations. That claim fails because the writ's scope does not extend to state collateral proceedings. *Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009). And we likewise cannot grant relief on Storey's claim that "the various errors that we have individually rejected [are], in the aggregate, a constitutional violation." *Hoffner v. Bradshaw*, 622 F.3d 487, 512-13 (6th Cir. 2010).

*        *        *

The district court's judgment is affirmed.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

CLAY, Circuit Judge, dissenting.  I respectfully dissent from the majority's decision to deny relief to Petitioner under the standards set forth by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d).  Moreover, I am unable to join the majority's opinion because I believe that the majority has avoided doing the difficult but necessary work required to reach its conclusions.  Simply stated, in its opinion, the majority's approach has been to dispose of a case that requires a rigorous application of the law to historical fact by failing to properly take account of the law or the relevant facts.

Though the majority opinion devotes several pages to providing an analysis of the bar on second or successive habeas petitions, only to conclude that this appeal is clearly not barred under binding precedent, the majority spends just shy of two pages outlining the facts of this Petitioner's crime and the performance of this Petitioner's counsel.  A mere two additional pages are devoted to an application of the law, which is only skeletally outlined, although the Supreme Court has, in recent months, provided this Court with a wealth of additional guidance directly addressing how we are to treat claims of ineffective assistance of counsel under AEDPA.  *See Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388 (2011); *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770 (2011); *Premo v. Moore*, ___ U.S. ___, 131 S. Ct. 733 (2011).

Had the majority followed this guidance, or the guidance set forth over 25 years ago in *Strickland v. Washington*, 466 U.S. 668 (1984), it may or may not have eventually reached the conclusion that it reaches today.  But it is not enough for the majority to simply state that "Storey's trial lawyer did a poor job," (Maj. Op. at 1), but take the analysis no further; to conclude that the Michigan Court of Appeals misstated the test for showing prejudice, but stop there; or to acknowledge that Storey's counsel failed to appeal the waiver of juvenile court jurisdiction, and failed to "prepare for trial and to argue effectively once he was there . . . failures [that] are serious," (*id.* at 10), but dismiss

these failures out of hand. Instead, having determined that the state court misinterpreted and misapplied *Strickland*—a holding that necessitates also finding that the state court's analysis "involved an unreasonable application of clearly established federal law" under 28 U.S.C. § 2254(d)(i)—the majority was then required to review Storey's claim of ineffective assistance of counsel under the standard of review provided to this Court through AEDPA, *Strickland* and its progeny. The majority has not met its obligation to do so.

## FACTUAL BACKGROUND

### I.     The Crime

At approximately 2:00 p.m. on November 7, 1984, Nathan Wilson ("Wilson") was found murdered at the Gold Mine store in Detroit. Wilson was a twenty-one year old store clerk who had been working at the Gold Mine for a little over a year at the time of his death. His primary responsibility at the Gold Mine was to buy and sell gold and jewelry.

In 1984, the physical premises of the Gold Mine was set up in such a way that store employees were separated from customers by a bulletproof plexiglass partition and a sliding steel door. A display case of jewelry and gold was kept on the employee side of the partition, but was fully visible from the customer side. All purchases were conducted through a rotating transaction window and store policy prohibited employees from allowing customers to enter the employee side of the establishment. The Gold Mine also kept a .357 Magnum revolver prominently on view atop the display counter, on the employee side of the partition, to discourage unruliness in the store. This set up was necessary because, in addition to buying and selling gold to the general public, the Gold Mine was also amenable to fencing stolen goods for local entrepreneurs.

By the age of fifteen, Petitioner Mark Storey ("Storey") had already become one such entrepreneur and was therefore a frequent visitor to the Gold Mine. Storey was, at this time, associated with several other petty criminals in the neighborhood, including Darin Henderson ("Henderson"), Anthony Witlow ("Witlow"), and Shawn Coats

("Coats"). The boys committed breaking and entering and other theft crimes throughout the neighborhood. Because the boys went to the Gold Mine often, they were all familiar with Wilson and the owner of the Gold Mine, James Floyd ("Floyd"). Storey's relationship with Wilson went beyond that of a customer—they were also friends.

On November 7, 1984, Wilson and Floyd arrived at the Gold Mine to open the store at 10:00 a.m. As was customary, Floyd weighed and inventoried the gold on hand for the day. He also provided Wilson with $1,000 in cash for the register and left the .357 revolver on the counter. Floyd reported that the store had approximately 220 grams of gold that day, which had a retail value of $10,000. After setting up the store, Floyd left the Gold Mine.

Storey and Witlow arrived at the Gold Mine before 1:00 p.m.[1] Although Storey had recently been cut out of a full body cast after a month's hospitalization and was still walking with the assistance of a cane, he was apparently eager to get back into the business of selling stolen property. He and Witlow had several stolen gold rings in their possession. Evidence suggests that at some point during this visit, Wilson let Storey and Witlow through the steel door to the employee side of the store.[2] While on the employee side, Storey and Witlow hung out with Wilson, smoked marijuana, and discussed the price that Wilson would be willing to pay for the rings. Sometime between 12:30 and 1:15 p.m., Wilson called Floyd from the store to advise Floyd that Wilson would be loaning ten dollars to Storey. Wilson was required to make such a call anytime he wanted to remove money from the till that would not be reflected in the receipts. Storey claimed that he also spoke to Floyd during this call; Floyd denied speaking directly with Storey.

---

[1] At trial, witnesses provided varying timelines for the period leading to the discovery of Wilson's body, but all report that the relevant events occurred between noon and 3:00 p.m.

[2] Floyd testified that it was strictly against store policy for employees to let customers into the employee section of the store and that Wilson would have been immediately fired if it had been discovered that he was doing so. Nonetheless, testimony from several witnesses suggested that Wilson was not under any threat or duress when he was seen talking with Storey and Witlow on the employee side of the partition.

Around this time, Dione McPherson ("McPherson") entered the store to sell a bracelet. McPherson testified to seeing two men behind the partition with Wilson, smoking marijuana. McPherson later identified one of the men as Storey.

Sometime after McPherson left the Gold Mine, the building manager, James Cassar ("Cassar"), and a plumber arrived at the store to repair a faucet in the employee bathroom. Cassar testified to seeing Wilson on the employee side of the store with two young black men. Cassar also said that one of the men was talking on the employee telephone.

David Kidd ("Kidd") also claimed to have gone to the Gold Mine that day to sell stolen jewelry. He testified that while there he saw Storey behind the plexiglass with Wilson, and saw Coats and Witlow in the customer area of the store.

At approximately 2:00 p.m., twin sisters Darlene and Marlene Holly ("Holly sisters") entered the store and discovered Wilson's dead body. Wilson was found sitting, slumped to the side, in a chair facing the plexiglass partition. In apparent panic and confusion, the Holly sisters left the store and called Wilson's mother, instead of calling the police. After attempting to call the Gold Mine and receiving no answer, Wilson's mother called her brother, Dwayne Black ("Black"), and requested that he go to the store to check on Wilson. When Black arrived at the Gold Mine, he saw a man, Roger Solomon ("Solomon") exit the store and flag down a passing police patrol car. Just seconds before, Solomon had walked into the Gold Mine and discovered Wilson's body.

Police entered the Gold Mine, secured the scene and commenced an investigation. Floyd arrived at the store at approximately 3:00 p.m.; he testified that he had been calling the store to talk to Wilson but could not get through. Because this was unusual, Floyd had decided to go to the store to see if there was a problem.

Upon investigation, police discovered three sets of palm and fingerprints on the employee side of the Gold Mine. One set, found on the telephone, was identified as belonging to Storey. Another set, found on a soda bottle, was identified as belonging to Coats. The third set could not be identified. Police also concluded that approximately

200 grams of gold was missing,[3] along with the $1,000 in cash and the revolver. A medical examination later determined the cause of Wilson's death to be three gunshot wounds to the back of the head—two at indeterminate range and one in direct contact. All three slugs were recovered and it was determined that the shots came from a .32 revolver.

Almost immediately after the murder, Floyd offered a $2,000 reward—later increased to $3,000—for information leading to the prosecution of the person who killed Wilson. In addition to telling people about the reward, Floyd also posted fliers on Dexter Avenue and elsewhere in the neighborhood. It appears that Storey became a suspect in the murder almost immediately, though it is unclear what caused this heightened interest.

Floyd claimed that two weeks after the murder, Storey came to the Gold Mine with at least Witlow, but possibly with another young man, to sell jewelry. At that time, Floyd agreed to purchase a gold chain (the "distinctive gold chain"). Contrary to normal practice, no receipt was given to Storey for the distinctive gold chain; the only receipt given for the transaction was made out to Witlow. Floyd testified that he later recognized the distinctive gold chain as one of the pieces that had been taken during the robbery, because he had previously repaired the chain with an unusual silver clasp. Upon making the discovery, Floyd called the police homicide investigator in charge of the case, Officer Kramer. Officer Kramer and Floyd met the next day and the distinctive gold chain was tagged as evidence. At trial, Storey claimed that Floyd fabricated the whole incident and that he had never returned to the Gold Mine to sell jewelry after Wilson's murder.

Approximately six months after the murder, Storey and Henderson went to the Gold Mine to talk to Floyd. Apparently there was "word on the street" that Storey was involved in the murder and he wanted to clear his name with Floyd. During their conversation Floyd told Storey that, while he did not necessarily believe that Storey

---

[3]Another twenty grams was found strewn on the floor of the shop, apparently dropped in the murderer's haste to escape.

committed the murder, he did believe that Storey was involved and knew the identity of the killer. Floyd said that he also suspected that Henderson was involved in the murder. Floyd then offered Storey the reward money for information, which Storey refused. This conversation was all conducted within earshot of Henderson.

That day, Henderson wrote a letter to Floyd about Wilson's murder, which he left with one of the employees at the Gold Mine. The letter accused Witlow of killing Wilson, and named Storey and Coats as, respectively, "inside man" and lookout. When Floyd received the letter, he made arrangements to meet with Henderson to bring him to the police precinct to make a statement, which they did the following day.

Henderson's letter to Floyd was written immediately after Henderson, who had been living with Storey at his parent's home, discovered that Storey would soon be sent to an in-patient drug rehabilitation program, which would necessitate Henderson finding new accommodations. In the letter, Henderson stated that he needed money badly and was desperate because he would soon be homeless. After Henderson gave his statement to the police, Floyd paid him some amount of reward money, which may have been as little as $120 and as much as $3,000.

In his official police statement, Henderson named Storey as Wilson's murderer, and Coats and Witlow as accomplices. Henderson also stated, for the first time, that he personally witnessed the crime. At trial, Henderson testified that he was out that day looking for Coats so that he could borrow money. When he rounded the corner of Dexter Avenue, he saw Coats sitting on a cement planter outside of the Gold Mine. Instead of approaching Coats, Henderson stated that he continued to walk down the block, past Coats, on the opposite side of the street. He then stopped "right across the street" from Coats, near the intersection of Elmhurst Street, and began watching Coats. At no point did Coats notice Henderson, although Henderson was apparently standing in unobstructed view. Henderson testified that he could see Witlow and Storey inside the Gold Mine, through the glass door. According to Henderson, after a couple of minutes Coats looked around and then started to walk away. Directly thereafter, Henderson heard two gunshots and then saw Witlow and Storey exit the Gold Mine

empty handed. Witlow and Storey met with Coats at the corner, and they all began running down an alley that cut through to Tuxedo Street. Henderson testified that he saw them running when he "peeked down Tuxedo," a block away from where he claimed to be standing. Henderson testified that there was nothing "peculiar or . . . different than normal in the way [any of the boys] walk[ed]."

Henderson also reported that Storey had confessed the murder to him three months after it occurred, stating, "I killed Nate. So what? F–k them." He further testified that Storey told him before the murder that "Nate could be had."

Two other witnesses testified against Storey at trial. William Walls ("Walls") claimed that Storey came to his house several months after Wilson's murder and confessed to killing someone in a robbery. Walls testified that he did not report the confession to the police because he did not know who Storey claimed to have killed until Walls' sister, who worked for Floyd, linked Storey's confession with Wilson's murder. Walls made a statement to police to this effect more than a year after the murder. Walls was brought to the police station by Floyd.

Kidd also testified at trial. He recounted that sometime in 1985 Storey and Kidd found themselves housed together in a youth detention facility. Kidd claimed that he took the opportunity to ask Storey if he had killed Wilson, and that Storey admitted the killing. Kidd also testified that Storey told him, before the murder, that Wilson could be an easy target for robbery.

Before his arrest, Storey gave a statement to police in which he admitted to being in the Gold Mine on November 7, 1984, and being on the employee side of the store smoking marijuana with Wilson and Coats. Storey claimed that Wilson often let him behind the partition, because they were friends, and also because Storey liked to see the weight reading on the scale when he was selling a piece of gold.**4** Storey denied having anything to do with the murder and also denied confessing to anyone.

---

**4**Storey's initial police statement was taken approximately one week after the murder.

## II.     The Trial

On May 16, 1986, attorney Charles Campbell was retained to represent Storey at trial. Campbell was the second attorney retained by Storey and was the attorney of record for the trial.[5] At the time that he retained Campbell, Storey was a sixteen year old with a ninth grade education and no resources sufficient to hire another attorney. (R. 27-18: *Ginther* Hr'g Tr. at 12–13.)

Campbell began making "missteps" from the very outset of the case. At the preliminary stage, Campbell waived trial by jury. While there is some indication that Storey agreed to this waiver, the ability of an uneducated teenager to provide knowing and voluntary consent to such a waiver, especially in a prosecution almost solely reliant upon eyewitness testimony, is debatable. *See Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942) ("[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case."). Campbell also failed to challenge the jurisdiction of the Recorder's Court, even though there appears to have been a question of whether the order issued by the juvenile court judge waiving jurisdiction was facially defective.[6]

The trial began with the prosecution's opening statement. Campbell then stood to present the defendant's statement, which precipitated the following exchange:

> [COUNSEL]: Your honor, this young man, with his mother, talked to police and was given his rights et cetera, and this young man admitted—
> STATE: Objection. Hearsay.
> COURT: Well, it is hearsay, unless you put your client on the stand.
> [COUNSEL]: We are—well, I am not sure that we are.
> COURT: You might be better off reserving your opening statement until you decide whether you are—
> [COUNSEL]: I will come back to that in a minute, maybe.

---

[5] It appears that the first attorney retained by Storey was suspended from the bar before his trial began. (R. 27-18: *Ginther* Hr'g Tr. at 10–11.)

[6] Storey was fifteen years old at the time of the crime and seventeen years old at the time of trial. Under Michigan law, jurisdiction of his case initially rested in the juvenile division, but could be waived. *See* Mich. Comp. Laws § 712A.4.

(R. 27-2: Tr. at 12–13.)

Seemingly flustered, Campbell continued with an extremely brief and incoherent opening statement, to which the State entered objections at multiple points. For instance, in response to the prosecution's objection to Campbell raising the outcome of the criminal cases against Storey's alleged accomplices, Campbell responded,

> I don't know what the law—I do know what the law is vaguely in this area, but it seems to me that fairness, whatever seems to be common sense, will eventually be the law, and our case may be different. I am not prepared to argue that point right now.

(*Id.* at 15.) In response to an arguably rhetorical question from the court regarding whether the determination of other courts should be binding in Storey's trial, Campbell responded: "I'm not sure. I haven't thought that through, but I hope to." (*Id.* at 14.) At the conclusion of Campbell's opening, the trial court stated that it was having difficulty understanding the nature of the defense being presented, and attempted, to little avail, to gain clarification from Campbell.

Campbell's performance continued to underwhelm. Campbell did not cross examine the first six witnesses called to the stand by the State, which included Wilson's mother, who testified to the time of the discovery of Wilson's body; Dwayne Black, who testified both to the timeline of discovery of the body and the actions of the first police officers on scene; Marlene Holly, whose testimony was not entirely consistent with that of her sister, Darlene; Officer Bobby Bukines, who testified to police procedures at the scene, establishing all of them as proper, and to the state of the Gold Mine at the time of the arrival of the police; Roger Solomon, who testified to finding Wilson's body and to the state of the Gold Mine; and Officer Kenneth Day, who testified to the evidence of robbery (and who took Henderson's official police statement, though he was not questioned about it on the stand). Campbell did, briefly and perfunctorily, question the medical examiner, who testified to the cause of death, about puncture wounds found on

Wilson's body, which were explained to be post-mortem.[7] He also asked Darlene Holly, who testified to the state of Wilson's body and events leading up to the discovery, whether she "was looking at a clock and noting . . . times," although he never raised any argument about the discrepancies in the timelines provided by witnesses. (R. 27-3: Tr. at 41.)

Campbell stipulated to the admission of the following evidence: the identification of the bullet slugs, including type and match; approximately two dozen photographs and a police sketch of the crime scene; and the finger and palm print evidence and their identification as belonging to Coats and Storey. The only materials that Campbell independently entered into evidence were several photographs of the Gold Mine, taken with a Polaroid instant camera by Storey's mother more than a year after the crime, from an unestablished perspective, and at a different time of day than the murder.

Campbell stipulated to the testimony of the following witnesses: Thomas Brown, who accompanied Cassar to the Gold Mine to fix the plumbing; Dr. Russanw, the medical examiner who performed Wilson's autopsy; Sergeant Eggers, one of the first responding officers on scene; Sergeant Kimball, who "took an exculpatory statement from the Defendant that [the State chose] not introduce into evidence," (R. 27-3: Tr. at 57.); Stephen Yakimovich and Paul Kulesa, the evidence technicians on the case; and Russell Morgan, the fingerprint expert. Perhaps most importantly, after mistakenly failing to subpoena him, Campbell waived the testimony of Officer Kramer, the witness who was the keystone of his "defense theory," who he argued colluded with Floyd in furtherance of inducing Henderson and Kidd to falsely identify Storey as the gunman.

While Campbell admitted that he had been provided with discovery obtained by Storey's prior attorney, at various points during the trial Campbell requested to be given discovery that he had not yet seen, including the pivotal letter that Henderson wrote to Floyd, which Campbell did not request until he was in the middle of his cross

---

[7]At sentencing, Campbell attempted to enter evidence regarding the audibility of gunshots and the muffling of sound made by contact wounds, issues on which he failed to question either the medical examiners or police investigators during trial. (R. 27-22: Tr. at 457.)

examination of Floyd. (R. 27-4: Tr. at 121–23.)  Soon thereafter, Campbell requested discovery of police notes on the transaction regarding the distinctive gold chain. (*Id.* at 125.)  Because it was apparent to the court that Campbell had failed to review the discovery material in advance of trial and was unfamiliar with the evidence provided during discovery, halfway through the trial the court assigned attorney Mark Hall to Campbell to oversee discovery review and adjourned the trial for a day to allow time for Hall to assist Campbell. (R. 27-7: Tr. at 181–84.)

During cross-examination of Henderson, Campbell requested a recess to "prepare his thoughts," although the court explicitly cautioned him that doing so would mean that Henderson (who was still on the stand) and Kidd (who had yet to testify) would be placed in the same private holding room. (R. 27-7: Tr. at 240.)  Despite this warning, Campbell took the recess, allowing the two witnesses unsupervised time together, which is particularly troubling because the substance of Campbell's defense theory seemed to be that Henderson and Kidd, along with Walls, were colluding to frame Storey in order to earn a reward from Floyd. (R. 27-6: Tr at 190.)

Finally, and inexplicably, at no time during trial did Campbell raise the possibility that, even if Storey may have been at the scene of the crime, he may not have been the murderer or been aware that Wilson was in danger.[8]

## STANDARD OF REVIEW

We review the legal conclusions underlying a district court's denial of a petition for habeas corpus *de novo* and review its factual findings for clear error. *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009).  Our review of a petition for a writ of habeas corpus based on ineffective assistance of counsel is guided by AEDPA and the framework set forth by *Strickland v. Washington*.  "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is

---

[8]Less significant breaches of professional standards are also evident in the trial transcript, including the fact that Campbell apparently spent a fair amount of the trial pacing, making other distracting movements, and being generally disruptive and unprofessional. At certain points, he also apparently raised his voice in an effort to intimidate counsel for the State. (R. 27-6: Tr. at 193; R. 27-7: Tr. at 259.)

doubly so." *Harrington*, 131 S. Ct. at 788 (internal citations and quotation marks omitted).

## I.        AEDPA Deference

AEDPA permits a federal court to grant habeas relief only where a state court's adjudication on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law when "the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent," but reaches a contrary decision. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under § 2254(d)(2), "even if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination," unless that determination is unreasonable. *Wood v. Allen*, ___ U.S. ___, 130 S. Ct. 841, 849 (2010) (internal citations, quotation marks and alterations omitted).

"[R]eview under § 2254(d)(1) focuses on what a state court knew and did." *Cullen,* 131 S. Ct. at 1399. Therefore, this Court may only look to the record as it was developed before the state court. We may not issue the writ upon a mere determination that the "relevant state-court decision applied clearly established federal law erroneously or incorrectly;" instead, we must find the state court's application of the law objectively unreasonable. *Williams*, 529 U.S. at 411. "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010).

## II.     *Strickland* **Framework**

Ineffective assistance of counsel claims are governed by the framework of *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. 668, 687 (1984).

Under the first prong of the analysis, review of counsel's performance is based on an "objective standard of reasonableness," and measured against "prevailing professional norms." *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (citing *Strickland*, 466 U.S. at 688). These professional norms are judged by reference to the time of representation, and cannot be based on hindsight. *See Strickland*, 466 U.S. at 689 (stating that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). The burden lies with the petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

As the Supreme Court has recently reiterated:

> To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.

*Harrington*, 131 S. Ct. at 787 (internal citations omitted)

In order to satisfy the second prong of the *Strickland* inquiry, a petitioner need not prove to a certainty that but for counsel's deficiencies he would have been acquitted, but instead, "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In determining whether there exists a reasonable probability that counsel's deficient performance prejudiced the defendant, this Court may "examine the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case." *Mackey v. Russell*, 148 F. App'x 355, 364 (6th Cir. 2005) (citing *Blackburn v. Foltz*, 828 F.2d 1177, 1186 (6th Cir. 1987)).

## ANALYSIS

Under AEDPA-guided review of ineffective assistance of counsel claims, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 131 S. Ct. at 785. As recognized by the majority, the Michigan state court unreasonably formulated and applied the prejudice prong of *Strickland*. Under the proper prejudice analysis, it is highly unlikely that a fairminded jurist would disagree that Campbell's performance prejudiced Storey. Furthermore, a thorough review of the record compels the conclusion that Campbell's performance was deficient, and fell below all prevailing professional standards. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Because Campbell's performance was clearly deficient and prejudicial, and because the state court unreasonably interpreted and applied *Strickland* to the facts then before it when finding otherwise, the issuance of the writ is appropriate in this case.

###  I.     Deficient Performance

As Storey argued before the Michigan Court of Appeals, he claims in his habeas petition that his trial counsel was ineffective for failing to prepare adequately for trial, including failing to obtain proper discovery, failing to adduce information about agreements between Kidd and the State in exchange for Kidd's testimony, failing to uncover evidence of Kidd's prior false murder accusations, and failing to uncover evidence of Henderson receiving a reward for providing testimony. For the purposes of our review, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788.

The Michigan Court of Appeals, in the final state court adjudication of the case, made no finding as to whether Campbell's performance fell below an objective standard of reasonableness, as required for relief under *Strickland*. Instead, the state court proceeded on the presumption that Campbell's performance was deficient, but found that each instance of alleged deficient performance, examined in isolation, constituted harmless error. Therefore, the state court held that Storey failed to demonstrate prejudice. *People v. Storey*, No. 251271, 2005 WL 711756, at *1–4 (Mich. Ct. App. Mar. 29, 2005).

Though the state court failed to reach a holding on deficient performance, there is no reasonable argument to be made that counsel satisfied the *Strickland* standard. A reasonable application of *Strickland* reveals that Campbell was constitutionally deficient in the quality of representation provided and that his performance fell far below all prevailing professional standards. It is undisputed that Campbell failed to review discovery and to prepare for trial. There is no scenario under which a complete failure to investigate a case or to review available discovery can be assumed to be reasoned trial strategy or otherwise excused. *See Wiggins*, 539 U.S. 510. "[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable." *Id.* at 523.

In *Strickland*, the Court outlined the parameters of what it described as "counsel's duty to investigate":

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.*

*Strickland*, 466 U.S. at 690–91 (emphasis added). Under this standard, counsel is required to conduct investigation at least to the extent necessary to determine that no further investigation is necessary. It does not allow counsel to fail to conduct any investigation at all. *See Williams v. Taylor*, 529 U.S. 362 (2000).

In this case, Campbell spoke with Storey only once before trial[9], reviewed no discovery or potential evidence, and interviewed and subpoenaed no witnesses (with the exception of Storey's mother) in preparation for trial. Though Campbell was apparently provided access to some (or perhaps all) of the discovery material prior to the commencement of the trial, it is clear that Campbell did not review *any* discovery before the trial began. (R. 27-5: Tr. 181–82.) Campbell also failed to consult with Storey's prior attorney, who had submitted the discovery request on Storey's behalf.

Even though Campbell's defense theory, inasmuch as there was a defense theory, hinged on witness misidentification (or framing by witnesses), Campbell never reviewed the letter that Henderson, the only "eyewitness" to the crime, wrote to Floyd. Importantly, in that letter Henderson accused Witlow of committing the murder.

Furthermore, Campbell did not review the evidence surrounding the distinctive gold chain until cross-examination of Floyd was almost complete. Aside from the fingerprint evidence, which placed Storey at the scene before the murder, the distinctive gold chain was the only physical evidence linking Storey to the crime.

---

[9]Storey claims that Campbell spoke with him only once before trial, during which time they discussed payment, but did not discuss a theory of defense. (R. 27-18: *Ginther* Hr'g Tr. at 9–10.)

Campbell also performed no investigation regarding Floyd's cash payments to various prosecution witnesses and Floyd's personal connections to other witnesses, including Kidd and Walls. Campbell performed no discovery regarding the role that Officer Kramer played in the "frame job" that he accused Kramer of perpetrating against Storey, and then proceeded to waive Officer Kramer's testimony at trial because he neglected to subpoena him. (R. 27-10, 11: Tr. 314–15, 359–63.)

At trial, Campbell did not question Floyd about, or attempt to impeach him on, his previous statements that he believed that Henderson was involved in the murder, including in his sworn testimony at Storey's preliminary hearing. (R. 37-3: Tr. at 30.)

Campbell did not conduct investigation or discovery or put witnesses on the stand adequate to establish that Storey was walking with a limp and the assistance of a cane on the day of the murder and was incapable of running, though evidence in the record supports this conclusion. The only witness that Campbell put on to this effect was Storey's mother, who was not qualified to establish Storey's medical condition. Notably, Campbell was required to recall Ruth Storey to the stand in order to elicit testimony about Storey's medical condition, because he "forgot" to enter into evidence the photographs that she had taken of Storey. (R. 27-11: Tr. at 363–67.) Incredibly, Campbell also stated during trial, in response to a question from the court, that he was unsure of whether Storey was still wearing a cast at the time of the murder. (R. 27-1: Tr. at 16.)

Campbell additionally presented no evidence to suggest that either Witlow or Coats—both of whom were identified as being at the Gold Mine at the same time as Storey and behind the customer partition—may have committed the murder. Nor did he endeavor, at any time during the trial, to raise the question of their culpability at all, despite the fact that both Henderson and Floyd had, at different times, identified Witlow as the person who they believed committed the murder.

Finally, Campbell failed to challenge the jurisdictional waiver from the juvenile court[10], which may have been facially defective[11], and at any rate was substantively challengeable. While we cannot know whether such a challenge would have been successful, it is difficult to imagine an objectively reasonable strategy by Campbell in leaving unchallenged the decision to conduct a bench trial for a fifteen year old defendant in an adult court of limited felony jurisdiction, where adjudication before a juvenile court may have been available. It is even more difficult to find that approach reasonable when questions had already been raised, by Storey's prior attorney, concerning the facial validity of the waiver.

In short, Campbell subpoenaed no relevant witnesses, offered no alternate theory of the crime, put forward no coherent defense theory, challenged none of the prosecution's evidence and presented no pertinent defense evidence. And Campbell failed to do all these things on the heels of conducting no investigation and reviewing no discovery prior to trial. The state court's determination that such a performance by Campbell met prevailing professional standards of representation was unreasonable, as the evidence before it of Campbell's lack of reasonable baseline investigation was abundant and uncontroverted.

## II.       Prejudice

Though the Michigan Court of Appeals identified *Strickland* as the correct governing legal standard, it erroneously formulated the prejudice prong by holding that *Strickland* requires a showing that, "but for counsel's error . . . the trial court would have acquitted defendant of the charges." *Storey*, 2005 WL 711756, at *2. As the majority

---

[10]The majority contends that Storey fails to specifically argue that Campbell was ineffective as a result of his failure to contest the juvenile court waiver. However, because of the sheer number and pervasiveness of Campbell's legal errors and omissions, it would have been impossible, and even unnecessary, for Storey to enumerate each and every instance of Campbell's deficient representation.

[11]In *People v. Dunbar*, the Michigan Supreme Court held that a juvenile court, in waiving its jurisdiction, must make "findings, based upon substantial evidence and upon thorough investigation, [that] show either that the juvenile is not amenable to treatment, or, that despite his potential for treatment, the nature of his difficulty is likely to render him dangerous to the public, if released at age nineteen, or to disrupt the rehabilitation of other children in the program prior to his release." 377 N.W.2d 262, 387 (Mich. 1985) (internal citations and quotation marks omitted). No such findings were made by the juvenile court in Storey's initial waiver.

concedes, such an interpretation is patently incorrect and an objectively unreasonable application of federal law. *Strickland* does not require a certainty of acquittal absent deficient representation—instead it explicitly states that the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case"—but instead requires "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693.

"If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Cullen*, 131 S. Ct. 1399 (quoting *Williams*, 529 U.S. at 405). Here, because the state court completely misapprehended the *Strickland* standard, it also misapplied the standard to the facts of the case. A proper application of *Strickland* in this case leads to the conclusion that Storey was prejudiced by Campbell's deficient performance.

The Supreme Court recently held:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead*, Strickland* asks whether it is "reasonably likely" the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable.

*Harrington*, 131 S. Ct. at 791–92 (internal citations omitted).

Because the state court misapprehended the prejudice inquiry, we are left with the question of whether there is any reasonable analysis under which the state court could have found, under a correct application of *Strickland*, that Campbell's performance did not prejudice Storey. In finding that there was no prejudice, both the district court and the state court largely relied upon the fact that, though Campbell admittedly did not review any discovery until late in the trial, Campbell did, eventually, obtain most (if not all) relevant evidence. *See Storey*, 2005 WL 711756, at *3–4.

This fact is insufficient to render Campbell's deficient performance non-prejudicial.  Because Campbell had not seen several critical pieces of discovery before the case began, he was woefully unprepared for the trial, which clearly resulted in an inadequately conceptualized trial strategy and a completely absent defense theory.  This result is illustrated in the trial court's repeated entreaties for Campbell to clarify his defense theory, which began as early as Campbell's opening statement, and proceeded through Campbell's attempts to introduce innocence evidence at sentencing.

The trial court's assurance—which was heavily relied upon by the Michigan Court of Appeals—that it knew "what to disregard and what to take into consideration," also fails to offset the prejudice caused by Campbell's performance.  *See Storey*, 2005 WL 711756, at *2.  The trial court, as finder of fact, may have been capable of disregarding irrelevant evidence placed before it, but it was totally incapable of considering evidence that Campbell neglected to find, review or present.  And, with the exception of Storey's own testimony and his mother's Polaroid pictures, Campbell neglected to present any evidence at all.  Such a performance falls far below the level of subjecting the "prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984).

Even if Campbell had conducted a reasonable investigation and still determined that Storey had no viable defense, once "the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." *Id.* at 657 n.19.  A decision to present no defense on the facts of this case—where the physical evidence was weak and eyewitness testimony was plagued by credibility issues—would have been an incorrect decision, but if made after full investigation, may not have been a decision rising to the level of ineffective assistance of counsel.  But having performed no investigation and subpoenaed no witnesses, Campbell was completely unable to meet even the baseline requirement of holding the prosecution to its burden of presenting evidence of guilt beyond a reasonable doubt.

Had Campbell investigated and presented evidence that star eyewitness Henderson had previously identified Witlow as the murderer; that Floyd had offered and

paid out a reward for information; or even that Storey had been injured and was using a cane when the single witness testified to seeing him run from the scene of the crime, there is a substantial likelihood that the result of the proceedings would have been different.

Finally, the fact that Campbell, having done no investigation, failed to challenge the juvenile court waiver, either procedurally or substantively, supports the conclusion that Campbell's failure to perform as required resulted in prejudice to Storey. In Recorder's Court, Storey was exposed to a possible life sentence of imprisonment in adult prison. Had jurisdiction remained with the juvenile court, Storey would have been subject to a maximum detention until the age of nineteen. *See* Mich. Comp. Laws § 712A.18c; *see also People v. Hana*, 504 N.W.2d 166 (Mich. 1993) (discussing juvenile waiver in Michigan).

## CONCLUSION

To find that Campbell's actions in this case, which were so extreme, pass the test set forth in *Strickland,* is to strip *Strickland* of all real meaning. If there is one thing that we must know, it is that counsel cannot simply show up on the day of a murder trial, uninformed and unprepared, and make no argument and present no evidence in defense of his client. And that is precisely what counsel in this case did. For these reasons, I believe that a proper application of AEDPA to this case compels us to grant the writ, and I respectfully dissent.